MATTER OF ESTRADA-BETANCOURT

In Exclusion Proceedings

A-17251270

A-17251272

A-14326873

*Decided by Board April 12, 1967*

Since an alien who does not arrive in the United States at a designated port of entry is still in the act of entering .this country only if the circumstances at the time of his interception are consistent with his having proceeded directly from the border to the nearest such port for inspection, an entry into the United States has been made by appellants, natives and citizens of Cuba, who arrived at other than a designated port (about 20 miles east of Brownsville, Texas) and proceeded 10 miles inland by automobile to the airport at Harlingen, Texas where they were taken into custody by Service officers, having been in this country about 3 hours and allegedly en route to Miami, Florida where they intended to present themselves for inspection as political refugees: consequently, expulsion, and not exclusion, proceedings are the proper forum for consideration of their cases.

EXCLUDABLE: Act of 1952—Section 212(a) (20) [8 U.S.C. 1182]—Immigrant, no visa (all).

ON BEHALF OF SERVICE: Robert A. Vielhaber
    Appellate Trial Attorney
    (Oral argument)

    Bernabe Q. Maldonado
    Trial Attorney
    (Brief filed)

The record relates to three male aliens, natives and citizens of Cuba, who, on December 12, 1966, crossed to the United States from Mexico by boat at a point near the mouth of the Rio Grande, about 20 miles east of Brownsville, Texas. They then proceeded by automobile to the airport at Harlingen, Texas, which is approximately 20 miles northwest of Brownsville and 10 miles inland from the international boundry. They were there taken into custody by Service officers, at which time they had been on United States soil nearly three hours.

The subjects stated that they were en route to Miami, Florida, and that they intended to present themselves for immigration inspection as political refugees at that place, because: "* * * that is where all other Cubans are living now and being helped * * *". They were, however, transported to Brownsville for further interrogation. Subsequently, they were referred to a special inquiry officer for a hearing in exclusion proceedings, pursuant to sections 235 and 236 of the Immigration and Nationality Act (8 U.S.C. 1225 and 1226).

The special inquiry officer ordered those proceedings terminated, concluding that expulsion proceedings were required as to these aliens, under section 242 of the Immigration and Nationality Act (8 U.S.C. 1252). He then certified the case to this Board for review and final decision.

The Service strenuously urges that the special inquiry officer erred in ruling that exclusion proceedings were improper in this instance. It argues that the aliens were still in the act of entering the United States until they reached their interior destination, to wit, Miami, Florida. It would have us give full faith and credit to the testimony of the aliens that they intended to be inspected at that point.

The case of *Brazil* v. *Ahrens* [1] involved a group of Haitian aliens who arrived in the United States on a vessel which had to be towed into a port in Florida by a Coast Guard boat. They, too, apparently desired to be admitted to the United States as political refugees; they were paroled into the United States pursuant to section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182); and they were subsequently referred to a special inquiry officer for a hearing in exclusion proceedings. In the course thereof, it developed that they had never been lawfully admitted to the United States for permanent residence; that they desired to remain in the United States indefinitely; and that they were not in possession of appropriate documents to permit them to do so. In rejecting their claim that they were entitled to an expulsion proceeding rather than an exclusion proceeding, the court held:

The controlling question in determining whether Petitioners were entitled to a deportation proceeding rather than an exclusion proceeding is the issue of whether they had in fact made an "entry" within the meaning of that word as it is used in the Immigration and Nationality Act.

That is the test which must be applied in determining whether exclusion or deportation proceedings are proper in the case now before us

[1] U.S.D.C., S.D., Fla., No. 63–668 Civ.–CF, 12/24/63.

for consideration. The question of whether that "entry" is legal or illegal is immaterial (*Lam Fo Sang* v. *Esperdy*, 210 F. Supp. 786).

The case of *United States* v. *Ju Toy* (198 U.S. 252), involved a person of the Chinese race detained aboard a ship for deportation to China pursuant to an administrative decision that he was not a United States citizen. In denying his petition for habeas corpus, seeking a judicial trial on the issue of his citizenship, the Supreme Court of the United States pointed to the well-established principle that all persons attempting to enter the United States are subject to inspection by immigration officers for determination of their right to enter, regardless of the ground on which their claim to that right is based (p. 262). Accordingly, it is clear that the aliens in this case were subject to immigration inspection.

Section 241(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1251) provides that: "Any alien in the United States * * * shall, upon the order of the Attorney General, be deported who— * * * entered the United States without inspection at any time or place other than as designated by the Attorney General * * *.". Under the law, then, expulsion proceedings are required as to any alien who has entered the United States at other than a designated "port of entry."

The case of *Thack* v. *Zurbrick* (51 F. 2d 634), involved an alien previously admitted to the United States for permanent residence who was returning to this country from a visit to Poland, by way of Canada. He proceeded by train to the last Canadian station before reaching the Vermont border, where he sought advice from the American consular agent as to how he should get to his home in Massachusetts.[2] He was advised to go to the immigrant inspector at Newport, Vermont, six miles south of the border, and got a ride there but found the Immigration Office closed. He then stayed at a hotel in Newport overnight, and appeared at the Immigration Office as soon as it opened the following morning. He was thereupon made the subject of expulsion proceedings, on the ground that he had entered the United States without inspection. In ruling that the case was improperly in expulsion proceedings, in that the facts recited did not constitute an "entry without inspection," the court said:

* * * Such entry cannot be, in all cases, completed by that technical entry which occurs when the international line is crossed. If such crossing were not in connection with or merged into an actual inspection at the appropriate place, "entered" might have this technical meaning, but if the alien merely follows the ordinary path from the international line to the nearest inspection point and presents himself for inspection, his action in so doing cannot be an offense for

[2] He had apparently been unable to get a visa or reentry permit because of inability to obtain a passport.

which Congress intended he should be sent to his former foreign residence and forbidden return to this country. * * *

We cannot agree with the Service that the aliens involved in this case, who did not arrive in the United States at a "designated port of entry" did not have to "follow the ordinary path from the international line to the nearest inspection point," because they actually intended to be inspected at some other port, to wit, Miami, Florida. The language of the court in question is clear and unequivocal. It permits no other reasonable interpretation than the one we have placed upon it.

That aliens who do not cross the border at a "designated port of entry" must proceed directly to the nearest such port for inspection is, we think, made clear by the decision in *Giaconi* v. *Corsi* (64 F.2d 18). Therein, a resident alien returning from a short visit in Canada was arrested by a Customs border patrolman about one-half mile beyond the Customs and Immigration Office and charged in expulsion proceedings with entry without inspection and a crime prior to entry. The alien claimed that he intended to be inspected, but could not find the inspection station. The court, in upholding the propriety of expulsion proceedings, ruled that the inspector was not obliged to accept the alien's claim as to his intention where the circumstances of his presence beyond the inspection point (nearest) contradicted his claims. In that case they did, the alien having six fur coats and other dutiable items in his car.

To the same effect is the case of *Natali* v. *Day* (45 F.2d 112). Therein, a resident alien went to Montreal to assist another alien to enter the United States. They paid a taxi driver to convey them to the St. Lawrence River, and an Indian to row them across the river. They crossed the border without inspection and were apprehended by a United States officer shortly thereafter. Under those circumstances, the court held that Natali was properly ordered deported for "entry without inspection"—at other than a designated port of entry—in expulsion proceedings.

We think the foregoing authorities clearly call for the conclusion that these aliens, who did not arrive in the United States at a "designated port of entry," were required to proceed by the ordinary route to the nearest such port for their inspection. According to the list of such "ports" for these aliens who arrived in the United States by other than aircraft, Brownsville, Texas, was that "port" (section 1.51(c) (2)*.) We hold that when they evaded inspection at that place their "entry" was effected and they were thereafter properly the subject of expulsion proceedings for having "entered without inspection." We do

---

* Statement of Organization.

not think that the judicial decisions relied on by the Service, *infra*, call for a contrary conclusion.

Two of the cited cases (*Ex parte Chow Chok*, 161 F. 627; *U.S.* v. *Yuen Pak Sune*, 183 F. 260) involved Chinese aliens who were under continuous observation while still in Canada; while crossing the international boundary; and thereafter while proceeding to a point in the United States quite proximate to the "line," where it became evident that they did not intend to be inspected at the "nearest port of entry." The court held that those aliens were properly the subject of exclusion proceedings because they never enjoyed any freedom from official restraint. That, obviously, is not true in the present case.

The third case quoted by the Service (*Jew Lee* v. *Brough*, 16 F.2d 492) related to Chinese aliens first observed by inspectors in an automobile three miles south of the Canadian border. They were taken into custody one and a half miles further south, at which time they had been in the United States about ten minutes. The court therein found proper the subsequent administrative proceedings which resulted in an order for their deportation (expulsion), on the following grounds: (1) they were not in possession of immigration visas; (2) they had entered the United States at other than a designated port of entry; (3) they were likely to become public charges; and (4) they were found in the United States not in possession of certificates of residence required of Chinese laborers. On such facts, we fail to see how that case supports a conclusion that exclusion proceedings are proper herein. Actually, it supports the contrary conclusion we have reached. The only additional comment required in this connection is that the portion of the court's opinion on which the Service seizes was concerned with the quite diverse question of whether the aliens were entitled to a judicial trial on the issue of their citizenship, under the Chinese Exclusion Acts which have long since been repealed. Obviously, no ruling on that point could have any bearing on the present problem.

The last Chinese case referred to by the Service (*Lew Moy* v. *United States*, 237 F. 50) involved an indictment for "a conspiracy to commit an offense against the United States (Penal Code, s. 37) by knowingly bringing and causing to be brought from Mexico by land into the United States persons not lawfully entitled to enter or to remain in the latter country, and by aiding and abetting therein (23 Stat. 117, s. 11)." It was expressly averred, *inter alia*, that the aliens were to be taken to Rock Springs, Wyoming, and elsewhere in this country. The argument was advanced that the trial court erred in admitting evidence of acts subsequent to that of bringing the aliens across the "line" between Mexico and the United States. The Service attaches great weight

to the following language of the Court of Appeals in rejecting that argument:

Successfully to consummate the unlawful introduction of the prohibited aliens required more than the mere bringing of them across the line. It was necessary to evade the immigration officials by transporting them into the interior and concealing their identity.

We find the case not pertinent here, because of the following additional statement of the court on this point:

The subsequent assistance by defendants to that end may well have been an essential part of the unlawful project. It is not necessary that each conspirator participate in each step or stage of the common general design.

Obviously, in view of this language, the court was not concerned with the fact of entry (it apparently conceded it), but with acts subsequent thereto and related to helping the aliens to remain in this country, as charged in the indictment. In other words, the indictment charged a conspiracy consisting of two parts, to wit, introducing aliens into the United States, and assisting them to remain herein. The language under reference was concerned solely with the latter point.

We find no support for the Service view in the fact that under present-day travel conditions aliens can proceed by aircraft non-stop from foreign places to cities hundreds of miles inland in this country. We see no valid reason why they, too, would not be deportable once it becomes evident they did not intend to be inspected at the proper place. The inherent weakness in the Service position on this point is that it cannot be limited by time or distance and, accordingly, would result in the loss of controllable primary inspection. But this is precisely what the Attorney General sought to maintain when he published a separate and distinct list of "ports of entry" for aliens arriving in the United States via aircraft (section 1.51(c)(3)).*

The deferred inspection of aliens at those "ports" is permitted because of adequate control assured by sanctions against carriers, private or commercial, spelled out in the law and the related regulations.[3] Obviously, only utter chaos in enforcement of the immigration laws could result from permitting aliens to proceed to inspection points they believe will best suit their own interests. The Service action in conducting these aliens to Brownsville for inspection despite their testimony (which the Service asserts it believes) that they would be inspected in Miami, speaks for itself on this point.

We find it to be of no material significance here that section 287(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1357) author-

---

*Statement of Organization.

[3] Sections 237, 238, 239, 271, 272 and 273.

izes Service officers to arrest without warrant aliens entering or attempting to enter the United States in their presence or view, in violation of law. The reason is that the same statute also authorizes the arrest without warrant of aliens in the United States in violation of law, if it appears that they are likely to escape before a warrant can be obtained. Thus, obviously, the statute provides for the arrest without warrant of two classes of aliens: (1) those entering or attempting to enter the United States; and (2) those who have already entered the United States, if they are likely to abscond. Accordingly, the fact that these particular aliens were arrested without warrant still leaves open the question of whether they were entering or had already entered the United States.

By the same token, it is of no consequence that subsection (3) of section 287(a) of the Act authorizes Service officers patrolling the border to prevent the illegal entry of aliens into the United States to make "transportation checks" within a "reasonable distance" (defined by 8 CFR 287.2 as 100 air miles) from the external boundaries of the United States, and gives said officers access to private lands within a distance of 25 miles from such external boundaries. The right of immigration officers to patrol the border, and while so doing to arrest aliens without warrant, is an issue separate and distinct from the question of whether aliens have entered the United States. The latter is the only problem confronting us here.

8 CFR 287.3 does, as the Service points out, authorize Service officers "on the scene" to make a determination as to whether exclusion or expulsion proceedings shall be instituted in a given case, depending upon whether there is prima facie evidence of an actual or attempted entry into the United States. But the regulation does not make that initial administrative decision binding on this Board, and our jurisdiction to review the question (8 CFR 3 et seq.) would be otherwise rendered nugatory. The facts of this case, viewed in the light of the law and the controlling precedents, convinces us that the original "local" judgment on the point was incorrect.

We find it completely irrelevant that Mexico might be willing to accept these aliens as excludees, but would definitely be unwilling to accept them as deportees and that, therefore, our decision will place the Service in the position of having on its hands aliens whom it cannot deport, because of the political situation in which the United States presently finds itself vis-a-vis Cuba. In the first place, it is so well recognized as to obviate further discussion that mere convenience of enforcement does not justify construction of a statute not warranted by the language thereof, or the facts involved. Second, the situation thus outlined is not substantially different from that of countless aliens

found in the United States after many years for whom no country of deportation can be found, solely because of the passage of time. The peculiar situations thus created by the law are problems with which the Service must contend otherwise. They certainly do not justify this administrative tribunal in reaching a result unwarranted by the facts of this case applied in the light of the law and the dispositive interpretations thereof.

Finally, we agree with the Service that it was improper for the special inquiry officer to take administrative notice of the fact that the Service does not always institute exclusion proceedings against Mexican aliens apprehended as close to the border as these aliens were. It may well be, as the Service urges, that in the Mexican cases referred to the evidence was clear that the aliens involved had already "made good" their entry into the United States. But the important point is that the answer to the problem presented depends upon the facts peculiar to this case and to it alone. By the same token, we also think that the special inquiry officer improperly referred in his decision to cases involving other Cuban nationals, as evidence of the employment of double standards by the Service in determining whether exclusion or expulsion proceedings are proper in any given instance. Nevertheless, for the reasons hereinbefore set forth, we conclude that his decision must be approved.

**ORDER:** It is ordered that the special inquiry officer's decision of January 17, 1967, directing that the exclusion proceedings in this case be terminated be and the same is hereby affirmed.