## MATTER OF LENNON

### In Deportation Proceedings

### A–17595321

*Decided by Board July 10, 1974*

(1) Motion to defer decision on appeal in deportation proceedings pending outcome of court actions by respondent the issues of which relate to his attempt to challenge the district director's decision to issue order to show cause in his case, is denied since a determination as to the institution of deportation proceedings against a deportable alien is a matter outside the scope of jurisdiction of the Board. Further, the pursuit of collateral remedies in the courts does not require the delay of deportation proceedings against him (*Matter of Agarwal*, 13 I. & N. Dec. 171).

(2) Since respondent was found to be ineligible for adjustment of status under section 245 of the Immigration and Nationality Act as a matter of law, there was no opportunity for exercise of discretion with respect to his application. Therefore, the claim of prejudgment advanced by respondent must necessarily be rejected.

(3) The decision whether or not to grant voluntary departure under 8 CFR 242.5, or to revoke such privilege once granted, is a matter within the sole discretion of the district director.

(4) Since "marihuana" includes "cannabis resin" within the meaning of section 212(a)(23) of the Act, and since a conviction for possession of cannabis resin under the Dangerous Drugs Act of 1965 of England required that the defendant have had knowledge that he possessed an illicit substance which proved to be cannabis resin, respondent's conviction, upon a plea of guilty, to the charge of possession of cannabis resin in violation of the Dangerous Drugs Act of 1965 of England is a conviction of a law relating to the illicit possession of marihuana within the meaning of section 212(a)(23) of the Act. Therefore, he is statutorily ineligible for adjustment of status under section 245 of the Act.

CHARGES:

Order: Act of 1952—Section 241(a)(9) [8 U.S.C. 1251(a)(9)]—Non-immigrant visitor—failed to comply with conditions of such status.

Act of 1952—Section 241 (a)(2) [8 U.S.C. 1251(a)(2)—Non-immigrant—remained longer than permitted.

ON BEHALF OF RESPONDENT:
Leon Wildes, Esquire
515 Madison Avenue
New York, New York   10022

H. Miles Jaffe and
Eve Cary, Esquires
New York Civil Liberties Union
84 Fifth Avenue
New York, New York   10011
(Amicus Curiae)

ON BEHALF OF SERVICE:
Vincent A. Schiano
Trial Attorney

Of counsel:
Burt Neuborne, Esquire
American Civil Liberties Union
22 East 40th Street
New York, New York 10016

The respondent is a male alien who is a native and citizen of the United Kingdom. In 1971 he applied for a nonimmigrant visa and was found by a consular officer to be ineligible for such a visa under section 212(a)(23) of the Immigration and Nationality Act because he had been convicted of possession of marihuana. However, he applied for and received a waiver of inadmissibility under section 212(d)(3)(A) of the Act, which permitted him to be temporarily admitted to the United States as a nonimmigrant.

The respondent entered the United States with his wife, a native and citizen of Japan, on August 13, 1971. They were authorized to remain until February 29, 1972, but they did not depart from the United States by that date. They received a letter from the district director, dated March 1, 1972, informing them that their authorized stay had expired, that the Service expected them to depart from the United States by March 15, 1972, and that failure to depart would result in the institution of deportation proceedings. On March 3, 1972, the respondents filed petitions for preferred immigration status under section 203(a)(3) of the Act.[1]

In a letter dated March 6, 1972, the district director informed the respondent and his wife that the privilege of voluntary departure from the United States had been revoked pursuant to 8 CFR 242.5(c) because the district director had learned that they had no intention of departing from the United States by March 15, 1972. Orders to show cause were issued on March 6, 1972 charging the respondent and his wife with being deportable under section 241(a)(2) of the Act for having remained in the United States after their authorized stay had expired on February 29, 1972. Superseding orders to show cause were issued the next day repeating the charge of remaining longer than authorized and adding a charge which alleged failure to comply with the conditions of nonimmigrant status under section 241(a)(9). The latter charge was not pursued further by the Service.

A deportation hearing was held. In a decision dated March 23, 1973, the immigration judge found (1) that the respondent and his wife were nonimmigrants who had stayed longer than authorized and were there-

---

[1] These petitions were approved on May 2, 1972.

fore deportable under section 241(a)(2) of the Act; (2) that the respondent's wife was statutorily eligible for adjustment of status under section 245 of the Act, and that this relief should be granted in the exercise of discretion; (3) that the respondent was statutorily ineligible for adjustment of status because he was inadmissible to the United States under section 212(a)(23); and (4) that the respondent was statutorily eligible for the privilege of voluntary departure and that he should be granted this privilege in lieu of deportation. The immigration judge ordered the respondent's wife's status adjusted to that of a permanent resident. He denied the respondent's application for adjustment of status and granted the respondent 60 days in which to depart voluntarily from the United States. An alternate order of deportation to England was entered.[2] The respondent has appealed from that decision.

## I. MOTION TO DEFER

On appeal, counsel has submitted a motion that we defer the decision in this case pending the outcome of two court actions filed by the respondent in the United States District Court for the Southern District of New York. These suits involve three basic claims by the respondent.

Initially, the respondent is seeking pursuant to 5 U.S.C. 552(a)(3) to compel production by the Service of certain data regarding "nonpriority" cases.[3] Counsel believes that the records relating to "nonpriority" cases may show that the normal practice of the District Director is not to institute deportation proceedings in circumstances similar to the respondent's, and that therefore the District Director abused his discretion by issuing an order to show cause in the present case.

Similar claims have been made that a discretionary Service policy, which permits certain deportable aliens who are beneficiaries of approved visa petitions to remain here until a visa becomes available, may confer an enforceable right to remain in the United States. Such claims have been consistently rejected. *Vassiliou v. INS*, 461 F.2d 1193 (C.A. 10, 1972); *Spata v. INS*, 442 F.2d 1013 (C.A. 2, 1971), cert. denied, 404 U.S. 857 (1971); *Armstrong v. INS*, 445 F.2d 1395 (C.A. 9, 1971); *Bowes v. District Director*, 443 F.2d 30 (C.A. 9, 1971); *Manantan v. INS*, 425 F.2d 693 (C.A. 7, 1970); *Lumarque v. INS*, Civil No. 71–1886 (C.A. 7, June 12, 1972); *Discaya v. INS*, 339 F. Supp. 1034 (N.D. Ill., 1972); *Matter of Merced*, 14 I. & N. Dec. 644 (BIA 1974); *Matter of Gallares*, 14 I. & N. Dec. 250 (BIA 1972); *Matter of Geronimo*, 13 I. & N. Dec. 680 (BIA 1971); *Matter of Li*, 13 I. & N. Dec. 629 (BIA 1970). We have held

---

[2] The respondent declined to designate a country to which he would prefer to be sent.

[3] "Nonpriority" cases are those involving deportable aliens where the government, for humanitarian or other reasons, chooses not to proceed with deportation proceedings or not to execute a deportation order.

11

that the decision to issue an order to show cause is a matter *solely* within the scope of the district director's prosecutorial discretion. *Matter of Merced, supra; Matter of Geronimo, supra; Matter of Gallares, supra;* cf. *Matter of Anaya,* 14 I. & N. Dec. 488 (BIA 1973). Our function is not to review the district director's judgment in instituting deportation proceedings, but to determine whether the deportation charge is sustained by the requisite evidence. Since the information regarding "nonpriority" cases relates to the matter beyond our scope of inquiry, we see no reason to defer our decision pending the outcome of court litigation which could take years, as counsel has admitted.

The respondent is also seeking an order compelling the Attorney General and certain Service officials to perform their statutory duty under 18 U.S.C. 3504 to affirm or deny the occurrence of illegal acts allegedly committed against the respondent, including wiretap and electronic surveillance. In addition, a hearing is requested pursuant to 18 U.S.C. 3504 to determine whether, and to what extent, unlawful acts have influenced the determinations made by the Service in the respondent's case. The respondent's request for an order enjoining deportation proceedings pending the outcome of his court actions was denied by a judge of the United States District Court for the Southern District of New York in a decision dated May 1, 1974.

Counsel claims that a court is the only forum in which evidentiary hearings under 18 U.S.C. 3504 can be conducted. We reject this contention. By its very terms, 18 U.S.C. 3504 is applicable to administrative hearings, and motions to suppress evidence have heretofore been made and adjudicated in deportation proceedings before immigration judges. See *Matter of Au, Yim and Lam,* 13 I. & N., Dec. 294 (BIA 1969), aff'd, *Au Yi Lau v. INS,* 445 F.2d 217 (D.C. Cir., 1971), cert. denied, 404 U.S. 864 (1971); *Matter of Wong,* 13 I. & N. Dec. 820 (BIA 1971); *Matter of Perez-Lopez,* 14 I. & N. Dec. 79 (BIA 1972).

Counsel did not present his motion under section 3504 at the hearing before the immigration judge. In an appropriate case, we can remand the proceedings to the immigration judge for a hearing on a motion under section 3504. Before we remand, however, we must be satisfied that a useful purpose would be served by such a remand, and that there was a valid reason why the motion was not presented to the immigration judge at the time of the hearing.

It is unclear exactly how much evidence of surveillance must be presented for a party to show that he or she is "aggrieved" within the meaning of section 3504(a)(1). Compare *In re Evans,* 452 F.2d 1239 (D.C. Cir., 1971), cert. denied, 408 U.S. 930 (1972), with *United States v. Doe,* 460 F.2d 328 C.A. 1, 1972). However, it is not necessary for us to reach that issue.

In the present case, all counsel has presented is a photocopy of an

undated memorandum indicating that some unknown party wished the respondent to be placed under surveillance. Counsel has refused to divulge how, when, and from whom that memorandum was obtained (Transcript of oral argument, pp. 25–31). We need more information than has been presented to warrant a remand for further hearing before the immigration judge.

Moreover, the thrust of the material offered seems to be in the direction of showing that someone improperly influenced the district director to institute deportation proceedings. As we have already stated, this is a matter outside the scope of our jurisdiction. Section 3504 relates to *evidence*. Counsel has not claimed that any *evidence* relating to deportability or ineligibility for adjustment of status may have been illegally obtained. In fact, since the evidence in the case consisted solely of the respondent's admitted presence in the United States after February 29, 1972, and the record of his conviction which he readily admitted, we have great difficulty in ascertaining what evidence the respondent may hope to have suppressed.

Finally, the respondent claims that his case has been prejudged by the Service. Counsel has cited *Accardi* v. *Shaughnessy*, 347 U.S. 260 (1954), and *Bufalino* v. *Kennedy*, 322 F.2d 1016 (D.C. Cir., 1963), as authority for this contention. Both of those cases involved aliens who were concededly deportable and were denied discretionary relief from deportation. Both aliens challenged the denial of discretionary relief on the ground that statements by the Attorney General had prevented the Board (or, in *Bufalino*, the Service) from making an independent discretionary determination as required by the applicable regulations. On appeal it was held that the district court should have given the aliens an opportunity to prove their allegations of prejudgment.

The present case, however, is distinguishable from *Bufalino* and *Accardi*. The respondent was found to be *statutorily ineligible* for adjustment of status. Since the immigration judge ruled the respondent ineligible as a matter of law, he never had an opportunity to exercise his discretion with regard to the application for adjustment of status. Therefore, he cannot be considered to have prejudged the respondent's application. See *Marcello* v. *Bonds*, 349 U.S 302, 313 (1954). The only discretionary relief for which the respondent was found to be statutorily eligible was voluntary departure, and with respect to this relief the immigration judge exercised his descretion *in favor* of the respondent.

Counsel has characterized the immigration judge's refusal to terminate proceedings as improvidently begun, and his refusal to issue subpoenas, as instances where applications for "discretionary relief" were prejudged. Counsel's characterization is incorrect. Those requests related to matters outside the scope of the immigration judge's jurisdiction, and therefore his denials were proper as a matter of law.

The power to terminate proceedings as improvidently begun belongs to the district director, who is an enforcement officer. The district director declined to move for termination of the present proceedings (Transcript of hearing, p. 1). As a quasi-judicial officer, the immigration judge had no power to grant the relief sought by counsel except upon the motion of the district director. 8 CFR 242.7; *Matter of Wong*, 13 I. & N. Dec. 701, 703 (BIA 1971); cf. *Matter of Vizcarra-Delgadillo*, 13 I. & N. Dec. 51 (BIA 1968).

On June 27, 1972, after the hearing had been completed, counsel moved that the immigration judge issue subpoenas pursuant to 8 CFR 287.4(a)(2). The subpoenas were sought in order to obtain evidence in support of the respondent's motion to terminate the proceedings as improvidently begun. Since the subpoenas related to a motion that the immigration judge had no power to consider, his refusal to issue the subpoenas was proper. See *Kahook* v. *Johnson*, 273 F.2d 413 (C.A. 5, 1960); *Matter of Anttalainen*, 13 I. & N. Dec. 349 (BIA 1969).

If the respondent had made a sufficient showing that illegal acts took place which might have tainted evidence used at the hearing, or if he had established a *prima facie* case of prejudgment, we would not have to defer to a court, but rather could remand the proceedings to an immigration judge for further hearing. In essence, however, the issues in both of the respondent's court actions relate to his attempt to challenge the district director's decision to issue an order to show cause. Determinations relating to the district director's decision to institute deportation proceedings are not germane to our function.

We are not required to delay deportation proceedings to allow the respondent to pursue collateral remedies in the courts. *Matter of Agarwal*, 13 I. & N. Dec. 171 (BIA 1969). The ends of justice are best served by insisting upon a speedy resolution of the administrative deportation proceedings. Should the collateral challenge remain undecided upon the conclusion of the deportation proceedings, the alien could then apply to the district director for a stay of deportation pending the outcome of his other litigation, and he could seek review of a denial of such a stay in the federal courts. This approach should afford an opportunity for any respondent with a meritorious claim to preserve his rights, while not providing an extra measure of delay for those who in reality seek nothing more. We must, therefore, deny the respondent's motion that we defer our decision.

In a letter to the Chairman of the Board of Immigration Appeals dated November 16, 1973, counsel expressed his understanding that we had agreed to inform him of our decision on his motion to defer prior to rendering a decision on the merits. Counsel was informed by a letter dated November 20, 1973 that such an understanding was incorrect.

Counsel had more than seven months in which to prepare for oral

argument on the merits of the case. He was informed in advance of oral argument by telephone and letter, and again at oral argument, that we believed he had sufficient time to prepare and that we expected argument on the merits. It was made clear to counsel at oral argument that by not arguing on the merits he was taking the risk, if the decision on his motion was adverse, that he would not have a further opportunity to argue. Counsel indicated that he fully understood our position (Transcript of oral argument, p. 13). He declined argument on the merits and stated that he would rely instead on his extensive brief (Transcript of oral argument, p. 47).

## II. DEPORTABILITY

The respondent is charged under section 241(a)(2) with having remained in the United States after the expiration of his authorized stay as a nonimmigrant. The respondent's authorization to remain in the United States ended on February 29, 1972, but the district director, in the exercise of discretion pursuant to 8 CFR 242.5, granted the respondent the privilege of departing voluntarily on or before March 15, 1972. The district director's discretionary action did not extend the period of the respondent's authorized stay, nor did it restore him to a lawful nonimmigrant status; the respondent remained here merely at the sufferance of the district director. *Matter of Merced*, 14 I. & N. Dec. 644 (BIA 1974); *Matter of Gallares*, 14 I. & N. Dec. 250 (BIA 1972).[4]

On March 6, 1972, the district director revoked the respondent's privilege of voluntary departure pursuant to 8 CFR 242.5(c). This regulation allows a district director to revoke voluntary departure granted under 8 CFR 242.5 without notice if he ascertains that the application for voluntary departure should not have been granted. The regulations vest no authority in the Board to review such a revocation. See 8 CFR 242.5(c); 8 CFR 3.1(b). The decision to revoke a grant of voluntary departure and institute deportation proceedings is a matter of prosecutorial discretion which is outside the Board's jurisdiction. *Matter of Merced, supra;* see *Matter of Geronimo*, 13 I. & N. Dec. 680 (BIA 1971); *Matter of Gallares, supra.* The respondent cannot claim that he was induced to remain past February 29, 1972 by the grant of voluntary departure, since at the time the district director granted that privilege, on March 1, 1972, the respondent had already remained longer of his own volition.

[4] The discretionary grant of voluntary departure under 8 CFR 242.5(b) should not be confused with action that a district director may take under 8 CFR 214.1(a) to extend the period of a nonimmigrant's authorized stay pursuant to an application made by a nonimmigrant whose authorized stay has not yet expired. We cannot agree with language on page 3 of the immigration judge's opinion which indicates that the granting of the privilege of voluntary departure by the district director extended the period of the respondent's authorized stay.

The present case can be distinguished from *Matter of Siffre*, 14 I. & N. Dec. 444 (BIA 1973). That case dealt with an alien who had been admitted as a nonimmigrant student for a fixed period of time. Before the authorized stay had expired, the district director attempted to "revoke" the alien's nonimmigrant student status and to charge him under section 241(a)(2) as a nonimmigrant who remained longer than permitted. We held that the district director had no authority to "revoke" a nonimmigrant status. If the district director believed that the alien was violating the conditions of nonimmigrant status, he should have instituted deportation proceedings under section 241(a)(9) for fail ure to maintain nonimmigrant status. The district director's other op tion was to wait until the alien's authorized stay had expired and then, i the alien failed to depart, to institute deportation proceedings unde section 241(a)(2) based upon the alien's having remained longer thai permitted.

The respondent's situation, however, is quite different. His au thorized stay expired on February 29, 1972. At that point he lost hi lawful nonimmigrant status. He remained in the United States merel as a deportable alien who had been granted the discretionary privileg of departing voluntarily pursuant to 8 CFR 242.5. The decision whethei or not to grant voluntary departure under 8 CFR 242.5, or to revoke such privilege once granted, is a matter within the sole discretion of the district director. We conclude that deportability under section 241(a)(2 of the Act has been established by evidence that is clear, convincing anc unequivocal.

### III. ELIGIBILITY FOR ADJUSTMENT OF STATUS

The respondent applied for adjustment of status under section 245 of the Act. In order to show eligibility for adjustment of status, an alien must establish that he was inspected and admitted or paroled into the United States, that he is eligible to receive an immigrant visa, that he is admissible to the United States for permanent residence, and that an immigrant visa is immediately available. Since adjustment of status is a privilege, the alien has the burden of establishing his eligibility. 8 CFR 242.17(d); *Montemurro v. INS*, 409 F.2d 832 (C.A. 9, 1969); *Cabrera v. INS*, 415 F.2d 1096 (C.A. 9, 1969).

The immigration judge found that the respondent was not admissible to the United States for permanent residence because he was excludable under section 212(a)(23) of the Act as one who had been convicted of violating a law relating to the illicit possession of marihuana. Section 212 (a)(23) provides for the exclusion of:

Any alien who has been convicted of a violation of, or a conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs or marihuana . . .

A certified copy of a record of conviction was placed in evidence, showing that on November 28, 1968, the respondent pleaded guilty in the Marylebone Magistrates' Court (England) to a charge of having a dangerous drug, cannabis resin, in his possession without being duly authorized (Ex. 10). The British statute which he violated was Regulation 3, Dangerous Drugs (No. 2) Regulations, Dangerous Drugs Act of 1965. Copies of the British statute and regulations were introduced as Exhibit 11. The pertinent statutory provisions are:

Dangerous Drugs Act 1965, section 1:

The drugs to which this Part of this Act applies are raw opium, coca leaves, poppy-straw, cannabis, cannabis resin and all preparations of which cannabis resin forms the base.

Regulation 3, Dangerous Drugs (No. 2) Regulations 1964:

A person shall not be in possession of a drug unless he is generally so authorised or, under this Regulation, so licensed or authorised as a member of a group, nor otherwise than in accordance with the provisions of these Regulations and, in the case of a person licensed or authorised as a member of a group, with the terms and conditions of his licence or group authority.

The respondent has admitted that the record of conviction relates to him (Transcript of hearing, p. 30). Nevertheless, the respondent contends that his conviction does not place him within the exclusion provision of section 212(a)(23) because (1) the British statute under which he was convicted did not require *mens rea*, and (2) cannabis resin is not "marihuana" within the meaning of section 212(a)(23).

As to the contention regarding *mens rea*, it is maintained by counsel in his brief that a binoculars case containing cannabis resin was found in the respondent's house, but that the respondent had no knowledge of the presence of the drug (Respondent's brief on appeal, p. 54; Transcript of hearing, p. 81). He pleaded guilty, counsel alleges, because lack of knowledge was not a defense to a prosecution under the Dangerous Drugs Act of 1965 (Transcript of oral argument, p. 46). Therefore, counsel claims, the respondent's plea of guilty was an admission only of physical control of a binoculars case which proved to contain a dangerous drug (Respondent's brief on appeal, p. 62). Counsel argues that the respondent did not admit any knowledge of the drug's presence, and that he therefore would not come within the class of persons whom Congress wished to exclude under section 212(a)(23).

The provisions of section 212(a)(23) were intended to deal with foreign as well as domestic convictions. See *Matter of Gardos*, 10 I. & N. Dec. 261 (BIA 1963, aff'd *Gardos* v. *INS*, 324 F.2d 179 (C.A. 2, 1963); cf. S. Rep. No. 1515, 81st Cong., 2d Sess. 410 (1950). However, under federal law, in order to be convicted of the crime of possession of marihuana one must have knowledge or intent to possess. 21 U.S.C. 844. The same is

true under the law of the District of Columbia, *United States* v. *Weaver*, 458 F.2d 825 (D.C. Cir., 1972), as well as the law of the vast majority of states. See Annot., 91 A.L.R. 2d 810, 821 *et seq.* (1963) and supplements. Therefore, it is fair to state that in enacting section 212(a)(23), Congress did not intend to exclude persons who were entirely unaware that a prohibited substance was in their possession. Cf. *Varga* v. *Rosenberg*, 237 F. Supp. 282 (S.D. Cal., 1964); *Matter of Sum*, 13 I. & N. Dec. 569 (BIA 1970). Since the respondent has raised a significant question regarding the knowledge requirement of the British statute, we believe that an in-depth discussion of the British law is warranted.

### A. Knowledge Requirement of British Statute.

The history of the British laws relating to illegal possession of drugs is quite involved.[5] The earliest reported decision relating to possession of drugs is *R.* v. *Carpenter*, [1960] Crim. L. Rev. 633. In that case, drugs were found in the trunk of a car parked outside a house in which the defendant was arrested. The defense was that he had borrowed the car from a friend some 24 hours earlier and was unaware of the presence of the drugs. The trial court convicted the defendant, but the Court of Criminal Appeal reversed, holding that there was not sufficient evidence of conscious possession of the drug to go to the jury. Since it was conceded by the prosecution at trial that knowledge was a necessary element of the crime, this case does not help greatly in clarifying the legal definition of possession. However, one commentator has noted that "as the law tends to work rather by description than by definition the case is important as an illustration of a fact-situation where a person was held not to be in possession." A. Owen, Dangerous Drugs—Possession, The New Law Journal, September 28, 1972, at 844.

In *Lockyer* v. *Gibb*, [1966] 2 All E.R. 653 (Q.B.), the first fully reported case, a bottle containing tablets was discovered in the hold-all which the defendant was carrying. The tablets were found to be a prohibited drug. The defendant admittedly was aware that she was in possession of the bottle and that the bottle contained tablets; however, she claimed that a friend had given the bottle to her to look after and that she did not know what the tablets were. The trial court concluded that she was in unauthorized possession of a prohibited drug, notwithstanding the fact that she might not have known that the tablets she had were such a prohibited drug. The defendant was given leave to appeal her conviction.

On appeal, the Queen's Bench Division sustained the conviction, holding that while it was necessary for the prosecution to show that the

---

[5] There were several predecessors to the Dangerous Drugs Act of 1965. However, since the provisions relating to possession are nearly identical, no distinction between them will be made in the following discussion.

defendant knew that she had the articles which turned out to be a drug, it was not necessary that she should know in fact that the articles were a drug and a drug of a particular character. In the course of his opinion, Lord Parker rendered the following notable dictum:

> In my judgment, before one comes to a consideration of a necessity for *mens rea* or, as it is sometimes said, a consideration of whether the regulation imposed an absolute liability, it is of course necessary to consider possession itself. In my judgment, it is quite clear that a person cannot be said to be in possession of some article which he or she does not realise is, or may be, in her handbag, in her room, or in some other place over which she has control. That, I should have thought, is elementary; if something were tipped into one's basket and one had not the vaguest notion it was there at all, one could not possibly be said to be in possession of it.[6]

Lord Parker also referred to the Canadian case of *Beaver v. R.*, [1957] S.C.R. 531, in which the majority of the Supreme Court of Canada concluded under a similar statute that one who has physical possession of a package which he believes to contain a harmless substance, but which in fact contains a narcotic drug, cannot be convicted of being in possession of the drug. Lord Parker expressed disagreement with this view and agreed instead with the dissenting justices in *Beaver*.

In *R. v. Smith*, [1966] Crim. L. Rev. 558, the defendant was convicted of possessing a drug found in a room at a house where she was living. The trial judge had instructed the jury that it was necessary for the prosecution to show that the defendant lived in the room and "had a common interest in it so that she controlled all the things that were in it of any significance." The conviction was quashed by the Court of Criminal Appeal, which held that the jury should have been directed to decide whether the defendant knew of the drug and if so whether she had possession or control of it.

In the case of *Dalas*, [1967] Crim. L. Rev. 125, the defendant appealed from a conviction for possession of cannabis and the imposition of a three-year sentence. He claimed a belief that the substance he possessed was an Indian culinary herb rather than a dangerous drug. The Court of Criminal Appeal accepted the idea that for the sentence to have a rational foundation there must be convincing evidence that the defendant knew he was carrying cannabis rather than curry powder. The court concluded, however, that the evidence fully justified the trial judge's rejection of the defendant's explanation of innocence and also justified the imposition of the severe sentence.

The House of Lords considered for the first time the type of knowledge required for conviction of the statutory offense of drug possession in *Warner v. Metropolitan Police Commissioner*, [1968] 2 All E.R. 356 (H.L.). In that case, the defendant's van was stopped by police and two parcels were found, one containing bottles of perfume and the other

---

[6] [1966] 2 All E.R. at 655.

containing 20,000 amphetamine sulphate tablets. The defendant claimed that he sold perfume as a sideline and that he believed both packages, which had been left for him at a cafe, contained perfume. The jury was instructed that the defendant was guilty if he had control of the box which in fact turned out to be full of amphetamines, and that his claim of lack of knowledge was to be considered only in mitigation of sentence. Both the trial judge and the jury expressed the opinion that the defendant knew that the parcel contained the drugs, although this finding was not necessary for conviction. The defendant was convicted and the Court of Appeal affirmed. *R.* v. *Warner*, [1967] 3 All E.R. 93 (C.A.).

On appeal to the House of Lords, there were only two points on which the five justices could agree: (1) that as per Lord Parker's dictum in *Lockyer*, a person does not possess something which is slipped into his control entirely without his knowledge, and (2) that the appeal in *Warner* should be dismissed. As to the mental element necessary to convict a man of possession, the individual justices took diverse approaches.

Lord Guest felt that the prosecution must show that the accused had knowledge that he possessed the package or bottle which contained the drugs. According to this view, a person shown to be in possession of a package will be deemed to also possess its contents.[7]

Lord Morris expressed the opinion that a person possesses the contents of a container when he is knowingly in control of that container in circumstances in which he had the opportunity, whether availed of or not, to discover the contents.[8]

On the other hand, Lord Pearce and Lord Wilberforce both thought that a person could not be said to be in possession of the contents of a package if he was entirely unaware of those contents. These two justices concluded that proof that a person knowingly possessed a package raised a strong inference that he also knew the contents; however, the defendant should be allowed to assert in his defense that he had no knowledge of, or was genuinely mistaken as to, the actual contents or their illicit nature, and received them innocently, and that he had no reasonable opportunity since acquiring the package to acquaint himself with its contents.[9]

---

[7] [1968] 2 All E.R. at 384-85.

[8] Id., at 375.

[9] Id., at 388-90, 393-94. Lord Pearce further stated that "the term 'possession' is satisfied by a knowledge only of the existence of the thing itself and not its qualities, and that ignorance or mistake as to its qualities is not an excuse." Id., at 388. The introduction of this somewhat metaphysical distinction between "kind" and "qualities" was the subject of criticism by commentators. See, *e.g.*, D. Miers, The Mental Element In Drug Offences, 20 Nor. Ir.L.Q. 370, 380 (1969); A. Owen, Dangerous Drugs—Possession, The New Law Journal, September 28, 1972, at 844, 845. However, it should be noted that Lord Pearce felt the question of whether a difference in qualities amounts to a difference in kind "is a

Finally, Lord Reid took the view that the statute required the prosecution to prove facts from which the jury could infer that the defendant knew that he had a prohibited drug in his possession.[10] Lord Reid also suggested that: "In a case like this Parliament, if consulted, might think it right to transfer the onus of proof so that an accused would have to prove that he neither knew nor had any reason to suspect that he had the prohibited drug in his possession. . . ."[11] Lord Pearce put forth a similar suggestion.[12]

With the exception of Lord Guest, the justices expressed the opinion that the direction to the jury given by the trial court had been defective.[13] Nevertheless, Lords Reid, Pearce, and Wilberforce believed that the defendant's story regarding lack of knowledge was so preposterous that no reasonable jury could have acquitted him, and that therefore no injustice had been done.[14]

From the foregoing discussion, it is evident that a majority of the court, consisting of Lords Reid, Pearce, and Wilberforce, believed that there was a substantial knowledge requirement for conviction of possession of a dangerous drug. The inference that possession of a package meant possession of its contents could be rebutted by the defendant if he raised substantial doubt that he knew the contents; this could be done either by showing that he had no right to open the package and no reason to suspect its contents to be illicit, or by showing that he was genuinely mistaken as to the contents and had no reasonable opportunity to ascertain what they were. See D. Miers, The Mental Element In Drug Offences, 20 Nor. Ir.L.Q. 370, 389–90 (1969). The majority view in *Warner*, then, was the prevailing interpretation at the time of the respondent's conviction in 1968.

The cases which were decided after *Warner* confirm the existence of a substantial knowledge requirement for conviction of possession. In *R.* v. *Marriott*, [1971], 1 All E.R. 595 (C.A.), the defendant possessed a penknife with some traces of cannabis on the blade. On appeal from the defendant's conviction, the Court of Appeal held that, in order to establish unlawful possession of cannabis, the prosecution had to show that the defendant knew or had reason to know that a foreign substance was

---

matter for a jury who would probably decide it sensibly in favour of the genuinely innocent but against the guilty." [1968] 2 All E.R. at 388.

[10] *Id.*, at 367.

[11] *Id.*, at 367.

[12] "It would, I think, be an improvement of a difficult position if Parliament were to enact that when a person has ownership or physical possession of drugs he shall be guilty unless he proves on a balance of the probabilities that he was unaware of their nature or had reasonable excuse for their possession. . . ." *Id.*, at 390.

[13] *Id.*, at 370, 375, 391, 395.

[14] *Id.*, at 370, 391, 395. See section 4, Criminal Appeal Act of 1966. Lord Morris took the view that although the jury instruction was faulty, the admitted facts brought the

on the knife. The court noted that nothing said in *Warner* negated the necessity for such proof of knowledge. The conviction was quashed.

In *R. v. Irving*, [1970] Crim. L. Rev. 642, the defendant had a bottle in his possession which contained his stomach pills along with some amphetamines, the latter being a prohibited drug. He defended on the ground that the amphetamines had been prescribed for his wife, and that she must have put them in his bottle by mistake; consequently, he claimed, he had no knowledge that the amphetamines were there. The trial judge directed that if the defendant knowingly possessed the bottle he also possessed the contents, and the jury returned a guilty verdict. The Court of Appeal sustained the appeal, stating that the jury direction was wrong because the circumstances were comparable to those where a drug was slipped into a person's pocket or bag without his knowledge.

In *R. v. Fernandez*, [1970] Crim. L. Rev. 277, the defendant was convicted of possession of cannabis. The facts adduced at trial showed that the respondent had reason to believe that the package he was carrying contained a prohibited substance. The trial judge directed that "if the person were to receive the package under circumstances whereby it would be clear to any person of ordinary common sense that it might well contain either drugs or some other article which ought not to be in distribution the mere fact that it could not be shown that the carrier knew the exact contents would not prevent him from being guilty . . . the mere fact that the prosecution cannot show that he knew the exact nature of the drug would not matter if he did know that the package might well contain some prohibited article and if in fact it did contain a prohibited drug." On appeal it was held that, on the facts of the case, the direction was adequate. The Court of Appeal observed that: "The majority view in *Warner* was that one could not safely regard the offence as absolute: some mental element, or subjective test, might have to be applied."

In *Sweet v. Parsley*, [1969] 1 All E.R. 347 (H.L.), the House of Lords considered the question of whether a landlord who had no knowledge that cannabis was being smoked on his premises could be convicted for being concerned in the management of premises used for the smoking of cannabis under section 5(b) of the Dangerous Drugs Act of 1965. The court's holding that the conviction should be quashed hinged on the wording of section 5(b) and prior enactments. However, in the course of the opinion all of the justices agreed that knowledge is normally a requirement for conviction and that such requirement should not be lightly dispensed with. More important for the present case, several

---

defendant within his definition of possession, thereby justifying dismissal of the appeal. [1968] 2 All E.R. at 375.

22

justices commented as to what they thought *Warner* held in regard to the mental element required for conviction of possession.

Lord Reid stated that he had no reason to alter the view which he expressed in *Warner*, that knowledge is an element of the crime.[15] Lord Pearce, Lord Wilberforce, and Lord Diplock all expressed the view that the term "possession" as used in *Warner* imported a mental element.[16]

One commentator has stated that prior to the enactment of the Misuse of Drugs Act of 1971, the mental element required for conviction for drug possession consisted of two states:

> First, it had to be proved that an accused knew that he had actual or constructive possession of the article which contained the drugs. Secondly, although it could not be proved that the accused knew the exact nature of what he had, it had to be proved that there were facts from which it could be inferred that he knew he had a substance of an illicit nature, though not necessarily what kind of illicit substance it was. I. McClean & P. Morrish, *Harris's Criminal Law* 269 (22d ed. 1973).[17]

We conclude that the statute under which the respondent was convicted contained a sufficient knowledge requirement to ensure that persons whose possession was entirely innocent would not be convicted. In this respect, cases such as *Irving, Marriott, Smith,* and *Carpenter*

---

[15] [1969] 1 All E.R. at 349.

[16] Id., at 358, 360, 361.

[17] The Misuse of Drugs Act of 1971 attempted to clarify the law pertaining to possession of dangerous drugs. The Dangerous Drugs Act of 1965, under which the respondent was convicted, was repealed. Section 28 (3)(b) of the new Act specifically provided that a defendant shall be acquitted of various drug offenses, including possession:

(i) if he proves that he neither believed nor suspected nor had reason to suspect that the substance or product in question was a controlled drug; or

(ii) if he proves that he believed the substance or product in question to be a controlled drug, or a controlled drug of a description, such that, if it had in fact been that controlled drug or a controlled drug of that description, he would not at the material time have been committing any offence to which this section applies.

By the enactment of this section, Parliament appears to have been taking the course suggested by Lord Reid and Lord Pearce in *Warner*, and thereby placing the burden on the defendant who has been shown to be in the physical control to prove that his possession was innocent.

There are several statements in the legislative history of the Misuse of Drugs Act of 1971 which indicate that at least one member of Parliament believed that as a result of *Warner* the crime of possession under the Dangerous Drugs Act of 1965 was "absolute" and did not require any *mens rea*. 808 Parl. Deb., H.C. (5th ser.) 617–18 (1970). This view ignores the fact that there was a substantial knowledge requirement before one could even be said to be in "possession" of a drug. To say that possession is an "absolute" offense begs the question. The term "absolute" is very imprecise. As was pointed out by Lord Pearce in *Sweet* v. *Parsley*, [1969] 1 All E.R. 347, 358 (H.L.), the term "absolute" may describe "an offence to which the normal assumption of *mens rea* does not apply, but in which the actual words of the offence (without any additional implication of *mens rea*) may well import some degree of knowledge, *e.g.*, the word 'possession' as in *Warner's* case." We believe that the cases, not the Parliamentary Debates, are the most accurate source of information as to the state of English law at the time of the respondent's conviction.

establish that persons asserting plausible defenses based on lack of knowledge were not convicted. On the other hand, in cases such as *Warner, Lockyer, Fernandez,* and *Dalas,* where the defenses advanced were quite incredible, the courts sustained the convictions.

It is true that some of the formulations of the knowledge requirement in the British cases seem obtuse. It has been suggested that this may be due, in part, to judicial overreaction to the fear that juries would abuse a liberal formulation of the knowledge requirement and be too eager to allow drug peddlers to escape for lack of proof of knowledge. D. Miers, The Mental Element In Drug Offences, 20 Nor. Ir.L.Q. 370, 376–77, 383 (1969). See the commentary on the *Dalas* case in [1967] Crim. L. Rev. 125. This fear may have been misplaced; however, we do not believe that the Dangerous Drugs Act of 1965 created an offense which permitted the conviction of persons whose possession was innocent and readily explainable.

Conviction for possession of cannabis resin under the Dangerous Drugs Act of 1965 required that the defendant have had knowledge that he possessed an illicit substance which proved to be cannabis resin. A person who was entirely unaware that he possessed any illicit substance would not have been convicted under the Dangerous Drugs Act of 1965. The respondent's plea of guilty to the charge of possession of cannabis resin under the Dangerous Drugs Act of 1965 is a conviction of a law relating to the illicit possession of marihuana within the meaning of section 212(a)(23) of the Immigration and Nationality Act.

Furthermore, counsel's intimation that the respondent pleaded guilty on the advice of British counsel that British law did not permit a defense of lack of knowledge is not reflected in the record. In a letter dated March 14, 1972, British counsel retained by the respondent at the time of his conviction stated that he believed the respondent had a good defense on the facts of the case.[18] However, the respondent allegedly expressed a concern for the welfare of his wife, who was then pregnant and suffering physical and emotional difficulties, if she were called upon to testify. British counsel stated that he "was obliged to explain to him [the respondent] that the only course open that would obviate the need for her [his wife's] appearance would be for him to plead guilty." The letter implies that the respondent pleaded guilty to obviate the necessity for his wife's appearance as a witness. British counsel does not state that his advice to the respondent, or the respondent's decision to plead guilty, had anything to do with the unavailability of a defense based on lack of knowledge under the British statute.

The respondent had an opportunity to obtain advice of competent

---

[18] A copy of this letter is appended to the respondent's motion to terminate dated March 24, 1972.

counsel and to fully litigate all possible defenses. He chose instead to take a calculated risk by pleading guilty to the charge. Deportation proceedings are not a forum for redetermining the question of guilt, which has already been established by the respondent's plea. See *Rassano v. INS*, 377 F.2d 971, 974 (C.A. 7, 1966), vacated and remanded on other grounds 377 F.2d 975 (C.A. 7, 1967); *Giammario v. Hurney*, 311 F.2d 285, 287 (C.A. 3, 1962); *Matter of Gutierrez*, 14 I. & N. Dec. 457 (BIA 1973). Although counsel indicated at oral argument that a challenge to the British conviction was being contemplated, we have received no information that such a challenge has actually been undertaken (Transcript of oral argument, pp. 45–6).

### B. Is Cannabis Resin Marihuana Within the Meaning of Section 212(a)(23)?

The respondent asserts that the term "marihuana" as used in section 212(a)(23) does not include cannabis resin. Counsel introduced expert testimony by Lester Grinspoon, M.D., and a book written by Dr. Grinspoon, to show that cannabis resin is not marihuana (Transcript of hearing, pp. 35–43; Exh. 13).

According to Dr. Grinspoon, there are three grades of intoxicating drug which are prepared in India from the plant *Cannabis sativa* (L.), and which serve as standards against which preparations produced in other parts of the world are compared for potency. *Bhang* consists of *Cannabis sativa* leaves dried and then crushed into a coarse powder and perhaps mixed with seeds and chopped up stems of the plant. *Ganja*, the second strongest preparation, is made from the tops of cultivated female plants and is estimated as being two or three times as strong as *bhang*. Pure resin of the pistillate flowers is called *charras* and is the most potent of the intoxicants, being five to eight times more potent than *bhang*. *Charras*, or cannabis resin, is called *hashish* in some places.

Dr. Grinspoon has stated that the chemical compounds responsible for the intoxicating effect of cannabis are commonly found in the resin. Although it is generally believed that the plant's active agents are found solely in the resin, there is insufficient evidence to support this hypothesis. It is possible that other parts of the female and male plants may contain active substances.

The gist of Dr. Grinspoon's testimony is that, as used in the United States, the term "marihuana" refers only to a preparation comparable to Indian *bhang*, and should be distinguished from cannabis resin which is comparable to Indian *charras* (or *hashish*) (Transcript of hearing, p. 37). While this argument has some technical appeal, we are not persuaded by it.

The term "marihuana" is not defined in the Act, nor is the legislative history explicit as to the meaning to be given to the term. In the absence

25

of explicit legislative guidance, we must strive to interpret the Act in a manner consistent with the congressional purpose.

The provisions for the exclusion and deportation of persons convicted of possession of marihuana were part of a congressional scheme to deal with the evils of drug abuse. S. Rep. No. 1651, 86th Cong., 2d Sess., U.S. Code Cong. & Ad. News 3134–35 (1960). In other statutes having the same objective, Congress has treated the term "marihuana" as including cannabis resin. 21 U.S.C. 802(15); Act of August 16, 1954, ch. 736, 68A Stat. 565; Act of July 18, 1956, ch. 629, §106, 70 Stat. 570; see *United States* v. *Piercefield*, 437 F.2d 1188 (C.A. 5, 1971), cert. denied, 403 U.S. 933 (1971); *United States* v. *Cepelis*, 426 F.2d 134 (C.A. 9, 1970), cert. denied, 404 U.S. 846 (1971). In the absence of express congressional direction to the contrary, we shall not create a distinction between cannabis resin and marihuana under the Immigration and Nationality Act.

Several federal courts have noted that *hashish* (cannabis resin) is merely a refined form of marihuana. *United States* v. *Piercefield, supra;* see *United States* v. *Cepelis, supra*. It would be illogical to construe the term "marihuana" under section 212(a)(23) as including the cannabis leaves (possibly mixed with stems and seeds) which contain intoxicating cannabis resin, while not including the pure form of the resin which has a much greater intoxicating effect. While it is true that ambiguous provisions of the immigration laws are often construed in favor of the alien, this general maxim does not require us to ignore common sense and legislative objectives in order to reach a construction favoring the alien. Cf. *Chanan Din Khan* v. *Barber*, 253 F.2d 547, 550 (C.A. 9, 1958), cert. denied, 357 U.S. 920 (1958).

*Matter of Paulus*, 11 I. & N. Dec. 274 (BIA 1965), is distinguishable. That case involved a *factual* issue concerning the identity of the drug that the alien was convicted of trafficking in. The record of conviction referred only to a "narcotic drug" under California law, which included substances not defined as "narcotic drugs" under the immigration laws as interpreted by the federal courts. Since the conviction was alleged to be the ground for deportation under section 241(a)(11), we held that the factual uncertainty as to what drug was involved had to be resolved against the Service, the party bearing the burden of proving deportability.

In the present case, however, there is no factual dispute as to what drug the respondent was convicted of possessing. The issue is a *legal* one: Is cannabis resin "marihuana" within the meaning of section 212(a)(23)? We have resolved this legal issue against the respondent.

Counsel has cited *Matter of Gray*, A-30310271 (IJ September 23, 1971), an unpublished decision by an immigration judge, which held that hashish is not "marihuana" within the meaning of section 212(a)(23) of

26

the Act. The Service took an appeal from that decision, but the appeal was later withdrawn. Such withdrawal, however, does not indicate Service acquiesence to that decision. Cf. *Matter of Mangabat*, 14 I. & N. Dec. 75 aff'd (BIA 1972), on other grounds *Cabuco-Flores* v. *INS*, 477 F.2d 108 (9 Cir. 1973). Our decisions are binding precedent on the immigration judges, rather than vice versa. 8 CFR 3.1(g). The short answer to counsel's use of *Gray* is that we disagree with that decision and decline to adopt its reasoning in the present case.

In his brief, counsel attacks the constitutionality of section 212(a)(23).[19] As he concedes, however, we have no power to consider a constitutional challenge to the statutes which we administer. *Matter of Santana*, 13 I. & N. Dec. 362, 365 (BIA 1969); *Matter of Wong*, 13 I. & N. Dec. 820, n. 2 (BIA 1971); *Matter of L—*, 4 I. & N. Dec. 556, 557 (BIA 1951).

We are not unsympathetic to the plight of the respondent and others in a similar situation under the immigration laws, who have committed only one marihuana violation for which a fine was imposed. Nevertheless, arguments for a change in the law must be addressed to the legislative, rather than the executive, branch of government.

## IV. SUMMARY AND CONCLUSION

We have concluded that the respondent's motion to defer our decision must be denied. We have also concluded that the respondent is deportable under section 241(a)(2) of the Act, and that he is statutorily ineligible for adjustment of status under section 245 of the Act. The respondent is not eligible for any relief from deportation except voluntary departure, which has been granted to him by the immigration judge. The immigration judge reached the correct result; the appeal will therefore be dismissed.

ORDER: The appeal is dismissed.

*Further order:* Pursuant to the immigration judge's order, the respondent is permitted to depart from the United States voluntarily within 60 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure so to depart, the respondent shall be deported as provided in the immigration judge's order.

---

[19] We have also considered the *amicus curiae* brief submitted in behalf of the respondent by the American Civil Liberties Union. A large portion of that brief is devoted to arguments concerning the constitutionality of section 212(a)(23). We believe that the other issues raised in the *amicus* brief have been dealt with adequately in the course of our opinion and need not be reiterated.

27