**THACK et al. v. ZURBRICK, District Director of Immigration.**

Nos. 5834, 5835.

Circuit Court of Appeals, Sixth Circuit.
June 30, 1931.

Benjamin A. Rossin, of Detroit, Mich. (Catherine G. Herlehy, of Detroit, Mich., on the brief), for appellants.

W. G. Comb, of Detroit, Mich. (Gregory H. Frederick, of Detroit, Mich., on the brief), for appellee.

Before DENISON, HICKS, and HICKENLOOPER, Circuit Judges.

DENISON, Circuit Judge.

These aliens, now husband and wife, came from Russia (territory now Poland), to the United States in 1912 or 1913. They were married at Lynn, Mass., where they continued to reside and where a child was born. They were apparently hard working and thrifty, and had supported themselves without difficulty. In February, 1921, the three went to Poland to visit relatives. They neglected to obtain a certificate, which apparently they could have had for the asking, which would have entitled them to re-entry within a year. In the latter part of 1921, desiring to return, and knowing that passports would be required, they went to the American consul, who told them he would give them a visa, but that they must first get passports from the Polish government. These could not be obtained. The reason is unknown, but it was most probably because they were not Polish citizens. After repeated failures to get these passports, or to get any papers from the American consul unless they first had passports, the husband, then called James Yafimetz, came alone to Canada, arriving there in January, 1922; and, being told that he could not be passed into the United States without any passport, he walked across the line, and, without inspection, returned to his home in Lynn. Later he sent for his wife and child, and in July, 1922, learning that they were to arrive in Quebec, he went up to meet them. Anticipating trouble on entering Canada, he again walked across the line without challenge. He met them in Quebec and brought them back on the train to the last Canadian station before reaching the Vermont border. Here they all disembarked and he sought advice from the American consular agent at this station, as he formerly had at another station, as to what he should do to get his family back to their home in Massachusetts. He apparently thought that, if the circumstances were once understood, they would be admitted. He was advised to go to the immigration inspector at Newport, Vt., and take the matter up. Newport was some six miles south of the border and was the immigration station in that neighborhood, where immigrants were inspected and passed or rejected, excepting as far as this could be done by assistants upon the train. When he finally learned that nothing could be done excepting in this way, it was rather late in the evening and the last train had gone, so he started to walk, but some passers-by gave him a ride to Newport. Inquiring for and finding the immigration station, he found it closed. Shortly his wife and child also arrived. They had been told to wait, but had taken advantage of an opportunity to ride to Newport. They

all stayed at the hotel there that night. Their luggage, which had been sent ahead, was then at the immigration station. In the morning he applied to the station, long before it was open, but when it was opened and he again applied he was arrested and detained as an unlawful entrant. A little later he and his wife were formally arrested upon a warrant of arrest, charging that they had entered without the passport and visa required by the act of 1918 and the President's Proclamation, that they had entered without inspection, and that they were persons likely to become public charges.

The above is the alien's story. He was not at first truthful as to the presence of his wife and child at Newport, but later explained that he had been afraid they would be locked up, as he was. Upon the whole, there seems no reason to doubt the substantial truth of the story, and the Board seemed willing enough to accept it as true—indeed, the only matter of doubt was whether he really intended to present himself for inspection at Newport or whether he hoped to get by unobserved.

In accordance with our practice in these cases, we have directed that the certified copy of the departmental record, which was used on the hearing below, be made a part of the record on appeal, but without printing, and this has been done.

While under this detention at Newport, the aliens were indicted for the crime of having entered without the necessary passports and visa, required by the act known as the Passport Control Act, of May 22, 1918 (22 USCA §§ 223–226), and the President's Proclamation of Aug. 18, 1918 (40 Stat. 1829). Upon examination pursuant to the departmental warrant, the inspector found them guilty of everything charged, and further found James guilty of "a felony or other crime or misdemeanor involving moral turpitude," because he had entered in January, 1922, in violation of the Passport Control Act. The Commissioner at Montreal reported this to Washington, and it came before the Board of Review. The Board recited the circumstances, and although not accepting the alien's story in full, held that "in any event, both aliens are clearly in the United States illegally, having entered without visaed passports." The Board further recited that the aliens were well thought of personally, and were not undesirable immigrants, and concluded: "It is recommended that the warrant and bond be cancelled if the State Department will waive the visa require-

ment." The State Department declined to do so, and thereupon the Board reconsidered the case and recommended deportation on the grounds that the aliens were likely to become public charges, that they had entered without inspection and in violation of the passport regulation.

We think there is no substantial evidence to support any one of these three grounds.

■ There was no likelihood that they would become public charges. They were well and strong and willing workers; they had maintained themselves successfully for some years at Lynn; they had very well to do relatives and friends who would provide for any emergency; they had money enough to travel to their destination; the finding in this particular was arbitrary.

It is now conceded that they were not subject to deportation for lack of visaed passports under the Passport Control Act and the President's Proclamation. This act expired on July 2, 1921 (42 Stat. 105). The quasi-continuation given by the Act of March 2, 1921 (22 USCA § 227) did not authorize deportation as the penalty for entering without passports. See U. S. v. Smith (D. C., Ill.) 36 F.(2d) 503, and the same case on appeal Feil v. Smith (C. C. A. 7) in 46 F.(2d) 229, 230. The entry was before the act of 1924, which provided for deportation in case of unlawful entry after that date, and which is not claimed to have retroactive effect.

■■ The January entry by James alone is not in question. It is not charged in either warrant, or referred to by the Commissioner or the Board. The transaction in July did not, in our judgment, constitute "entry without inspection." Such entry cannot be, in all cases, completed by that technical entry which occurs when the international line is crossed. If such crossing were not in connection with or merged into an actual inspection at the appropriate place, "entered" might have this technical meaning, but if the alien merely follows the ordinary path from the international line to the nearest inspection point and presents himself for inspection, his action in so doing cannot be an offense for which Congress intended he should be sent to his former foreign residence and forbidden ever to try to return to this country. If the statute were to receive this literal construction, all unauthorized immigrants arriving in Detroit from Canada would be subject to deportation, having traveled in the United States half a mile or so after crossing the line; and that at Newport the distance happened to be six miles can have no

substantially different effect. It seems to us entirely plain that, when the immigrant is inspected at the appropriate point, and when, because of the lack of the necessary papers, or for any other ordinary reason, he is not entitled to enter, the remedy is exclusion and not deportation.

If it were clear that the aliens had not intended to go to an inspection point, or to be inspected, but had only blundered into doing so, or had been apprehended in the effort to evade doing so, the question would be different; but that this alien had any purpose to escape inspection at Newport—beyond possibly a hasty plan abandoned while the opportunity for repentance was open—is not a reasonable conclusion upon this record; and we do not meet the question whether there was any evidence tending to support that conclusion because the Department did not make any finding to that effect, nor order deportation on that theory.

■ There is another reason why the warrant of deportation is bad,—at least as to the husband. In January, 1922, he entered from Canada, went back into Canada in July, and made the entry in question a few days later. Very clearly, upon this last entry, for which he was deported, he entered from foreign contiguous territory, and had entered that territory from the United States. The applicable provision is a part of section 156, title 8, USCA (section 20 of the act of 1917). It reads: " * * * If such aliens entered foreign contiguous territory from the United States and later entered the United States, or if such aliens are held by the country from which they entered the United States not to be subjects or citizens of such country, and such country refuses to permit their reentry, or imposes any condition upon permitting reentry, then to the country of which such aliens are subjects or citizens, or to the country in which they resided prior to entering the country from which they entered the United States." Since, in cases like the present, "the country in which they resided prior to entering the country from which they entered the United States" was the United States, this last clause plainly can have no reference to such a case as this; it refers only to the second alternative found in the quoted language; so that, excluding the inapplicable language, the clause reads: "If such aliens entered foreign contiguous territory from the United States and later entered the United States * * * then to the country of which such aliens are subjects or citizens." Hence, in such a case, the

Secretary has no option, but must deport the alien to the country of which he is a citizen. The initial option to select the "country whence he came" does not reach to this particular later clause. Conf. Gorcevich v. Zurbrick (C. C. A. 6) 48 F.(2d) 1054, April 7, 1931.

■ For the reasons set out in the Engel Case (C. C. A.) 51 F.(2d) 632, this day decided, this alien was not a citizen of Poland. Hence, there was no authority for deportation to that country.

We do not overlook the conduct of the aliens since their entry. They were released on bond pending departmental hearing, and also for trial on the indictment. They forfeited these bonds, disappeared, and have only recently been found, living under changed names. They should have made their contest immediately, but this later conduct has no bearing on the decisive question. Color is added by the fact that they were indicted and suffered bond forfeiture for an offense that had no legal existence.

The order discharging the writ of habeas corpus is reversed, and the case is remanded, with instructions to sustain the writ and discharge the aliens.