**In the Matter of the Application of Imane PHELISNA for a Writ of Habeas Corpus.**

**No. 82 C 2112.**

United States District Court, E.D. New York.

Nov. 24, 1982.

As Revised Feb. 3, 1983.

S. Bernard Schwartz, New York City, for petitioner.

Raymond J. Dearie, U.S. Atty., Brooklyn, N.Y. (Michael A. Mulqueen, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for respondent Charles Sava.

Arthur C. Helton, New York City (John Hartje, Barry Levenfeld, Gillian Dell, New York City, of counsel), for amicus curiae Lawyers Committee for Intern. Human Rights.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Petitioner Imane Phelisna, a native of Haiti, applied for a writ of habeas corpus pursuant to 8 U.S.C. § 1105a(b), which provides in pertinent part that "any alien against whom a final order of exclusion has been made" may obtain judicial review by habeas corpus proceedings.

On December 1, 1981 an immigration judge entered an order of exclusion and denied petitioner's application for asylum. The Board of Immigration Appeals (the Board) dismissed her appeal on July 8, 1982. She was detained by the Immigration and Naturalization Service (the Service) until paroled. She is thus in the constructive custody of the Service. *Cf. Arias v. Rogers,* 676 F.2d 1139, 1142 (7th Cir.1982).

Petitioner arrived without a visa in the United States on July 5, 1981, in a boat carrying some two hundred Haitians, who disembarked on a Florida beach near Miami. A report of the officers of the Public Safety Department of Dade County, Florida, shows that they apprehended the Haitians on Rickenbaker Causeway one quarter of a mile south of "Sundays Restaurant" and turned them over to the Service.

On July 28, 1981, the Service, claiming that petitioner had made no "entry" into the United States, instituted exclusion proceedings against her pursuant to 8 U.S.C. § 1226. When the hearing began on September 2, 1981, petitioner's counsel moved to convert it into one for "deportation"—technically, expulsion—on the ground that petitioner had "entered" the United States before being apprehended. Petitioner testified that she had arrived by boat, entered the United States on July 5, 1981, and did not know where she was. The immigration judge, who announced at the inception of the hearing that he would permit only "several questions" of petitioner and would limit "severely" the testimony, refused to subpoena the arresting officer, announced that "[t]he burden is on the applicant" to establish the impropriety of exclusion proceedings, and denied the motion to convert the hearing into one for deportation.

When the exclusion hearing was resumed on December 1, 1981, petitioner's counsel moved for reconsideration of the motion to change the proceeding to one for deportation and offered in evidence "a police report from Miami, Dade County." The immigration judge denied the motion for reconsideration, declined to accept the report in evidence, declined an offer of proof as to what the evidence would be, and found petitioner excludable under 8 U.S.C. § 1182(a)(20). After the hearing the immigration judge denied asylum and ordered petitioner excluded.

Petitioner appealed to the Board, which dismissed the appeal, holding that (1) petitioner had the burden of showing that she had made an "entry"; (2) intentional evasion of inspection is an element of "entry"; and (3) petitioner had "failed to prove" that element. The present petition followed, asking that petitioner "be restored to a deportation proceeding."

In order to put the issues in context it is useful to note that the immigration laws have long made a distinction between those aliens who have come to the United States seeking admission and those "in" the United States after an "entry," irrespective of its legality. *Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958). The Immigration and Nationality Act preserves the distinction. Those seeking admission are subjected to "exclusion proceedings" to determine whether they "shall be allowed to enter or shall be excluded and deported." 8 U.S.C. § 1226(a). Aliens once they have made an "entry" are subject to "expulsion" if they fall within those categories of aliens who may be "deported" by the Attorney General. 8 U.S.C. § 1251. Proceedings for expulsion are commonly referred to as "deportation proceedings." As will appear, Congress and the courts have conferred on aliens who have made an "entry" rights in addition to those accorded aliens who have not yet entered.

The government contends that petitioner is "excludable" under 8 U.S.C. § 1182(a)(20), which provides that among the aliens who "shall be excluded from admission into the United States" are those who when they apply for "admission" do not have a valid visa or other entry document. Petitioner contends that when she landed on the beach she had made an "entry" and should not be "excluded" but is entitled to be deported under 8 U.S.C. § 1251(a)(1), which provides that an alien shall be "deported" who "at the time of entry" was within a class of aliens "excludable by the law existing at the time of such entry." The term "entry" is defined in 8 U.S.C. § 1101(a)(13) to encompass, so far as pertinent, "any coming of an alien into the

United States, from a foreign port or place, . . . whether voluntarily or otherwise."

It may well make a difference to petitioner whether she is excluded or deported. If excluded, she can expect to be sent back to Haiti, since presumably she boarded the boat in that country. 8 U.S.C. § 1227. If deported, she must be deported to a country designated by her, provided it will accept her, unless the United States Attorney General concludes that deportation to that country would prejudice the United States. 8 U.S.C. § 1253(a). Moreover, if she is deportable, the Attorney General could, in his discretion, permit her to depart voluntarily. 8 U.S.C. § 1254(e).

In the light of all these considerations the government's contention that the case is moot has no merit. The controversy is real and substantial. *See Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937).

Petitioner contends that she made an "entry," by "coming . . . into the United States" from a foreign place within the meaning of 8 U.S.C. 1101(a)(13). She urges that "entry" occurred when she was present in the United States free from restraint. Quite patently the statute cannot be read to mean that mere presence in the United States is enough to show an entry. The inspection stations at which the United States determines whether aliens are admissible are per force inside the nation's borders. Congress could not have meant that an alien had come "into" the United States when he arrived at one of the usual points where the government is prepared to process applications for admission.

But if the alien crosses the border where there are no inspection facilities, for example, somewhere along the Mexican or Canadian borders or the coast line of the United States, common sense suggests that ordinarily the alien has "entered" the United States. Even under those circumstances the cases have made an exception where the alien has established that he had an intent to be inspected. Thus, in *Thack v. Zurbrick,* 51 F.2d 634 (6th Cir.1931), aliens, long time residents of the United States, returned to Poland for a visit without obtaining certifi-

cates entitling them to reentry here within a year. They came back across the Canadian border and headed for the nearest inspection station at Newport, Vermont. On arrival at the station they were arrested and charged with illegal entry. Later they were ordered deported. The court held that an alien who "merely follows the ordinary path from the international line to the nearest inspection point and presents himself for inspection" has not made an "entry" so as to be guilty of "an offense for which Congress intended he should be sent to his former foreign residence and forbidden ever to try to return to this country." 51 F.2d at 635. The court explained that had the aliens "not intended to go to an inspection point" or had they been apprehended "in the effort to evade doing so" the question would be different. *Id.* at 636. *See also United States ex rel. Giacone v. Corsi,* 64 F.2d 18 (2d Cir.1933).

The government and the Board seize on these decisions to argue that petitioner, in order to prove that she had "entered," must demonstrate that when she arrived on the beach she had an intent to "evade" inspection. Aside from the question of burden of proof, this court does not believe that the above cases prescribe as an element of "entry" an intent to evade inspection. It would be enough that the alien had no intention, whether through ignorance or otherwise, to follow the usual path to an inspection station.

But in any event in this court's opinion the Board was not correct in imposing on petitioner more than the burden of proving that she came physically into the United States at some point not in the vicinity of an inspection station. If the government wishes to exclude an alien landing at a point far distant from such a station on the theory that the alien had the particular intent to submit himself to inspection and was on the way to doing so, the government must prove it.

The allocation of the burden of persuasion is, of course, a matter of substantive policy, *see, e.g., Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943),

which Congress may set. *Cf. Steadman v. Securities and Exchange Com'n,* 450 U.S. 91, 95 & n. 10, 101 S.Ct. 999, 1004 & n. 10, 67 L.Ed.2d 69 (1981). But where Congress has not specifically addressed itself to the question and legislative intent is not otherwise apparent, we may assume that the issue has been left to the judiciary for resolution. *Cf. Woodby v. Immigration and Naturalization Service,* 385 U.S. 276, 284, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966). While the *Woodby* decision concerned the degree of proof, the same considerations of institutional competence bear on the allocation on the burden.

The government contends that Congress intended to impose the burden on petitioner and points to language in 8 U.S.C. § 1361, providing that when a person "makes application for admission, or otherwise attempts to enter the United States, the burden of proof shall be upon such person to establish that he ... is not subject to exclusion." The government asserts that petitioner. was "obviously a person 'attempt[ing] to enter the United States.'" But that simply begs the question. The issue is whether "entry" was accomplished. One who is attempting to enter has by hypothesis not yet entered and must show he is entitled to do so. But one who has entered is no longer attempting to do so.

There is thus no express statutory provision allocating the burden of proving "entry," and the court must apply traditional criteria in deciding the question. Plainly what is at stake both for petitioner and for the government is relevant. As noted above, under the statutory scheme "entry" is the criterion on which the acquisition of important rights depends. At risk for the alien is the loss of those rights, one of which is regarded by petitioner as literally vital, namely, the right to designate a country to which she is to be sent. At issue for the government is something far less critical, that is, some degree of administrative convenience.

The government argues that the burden of proving petitioner's intent should rest with her since the pertinent evidence on

that matter is more accessible to her than to the government. But the significant proof may well be not the self serving declarations of the alien but documentary evidence such as arrest reports and testimony by third persons as to the objective facts from which an inference as to intent may be drawn. The government is ordinarily more likely to have ready access to this evidence than the alien. For example, in this case the government had the resources and the ability to obtain testimony from those who observed the Haitians land on the shore and proceed along the highway and from the local police officers who apprehended them.

Moreover, to impose on petitioner the burden of showing more than the time, place and manner in which she came within the borders of the United States on the beaches of Florida would hardly be the appropriate method of narrowing the issues for decision. If the government contends that an alien had a peculiar intent, not ordinarily inferable from the physical facts, it is not unfair to ask the government to assert that contention and to prove it.

The Board, in addition to imposing on petitioner the burden of proving an intent to evade inspection, also said in its opinion that petitioner "was looking for immigration officials to test her status." There is no evidence in the record to support the supposition that as of the time that petitioner landed on the beach she was seeking out the immigration officials. The only conceivable support for such a finding is the following statement in her later application for asylum: "When we came to the beach in Miami, Florida, we met other Haitians who said that we should see the immigration officials." This language is equally consistent with a lack of intent at the time of landing to seek inspection. Indeed, the statement can scarcely be taken as evidence of the formulation of such an intent even after the landing. It speaks of what others said to her, not what she decided.

Any argument that the issue of "entry" should be litigated only in a deportation proceeding and not in an exclusion hearing is foreclosed by *Landon v. Plasencia*, —— U.S. ——, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982).

The matter is remanded to the Service for further proceedings consistent with this opinion. So ordered.