# MATTER OF G-

## In Exclusion Proceedings

### A-72761974

### *Decided by Board December 8, 1993*

(1) An alien with no colorable claim to lawful permanent resident status is properly in exclusion proceedings where he fails to satisfy his burden of proof that he has effected an "entry" into the United States. *Matter of Z-*, 20 I&N Dec. 707 (BIA 1993), followed.

(2) The determination of whether an alien has effected an entry into the United States is a matter appropriately litigated in exclusion proceedings.

(3) For purposes of section 101(a)(13) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(13) (1988), an "entry" into the United States requires: (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2) (a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint. *Matter of Z-*, *supra*, followed.

(4) The mere crossing into the territorial waters of the United States, whether detected or undetected, has never been held to constitute "physical presence" in this country "free from official restraint."

(5) The grounding of a vessel 100 or more yards off shore with its passengers facing a hazardous journey to land does not of itself constitute an entry into the United States.

(6) In the case of the *Golden Venture*, an alien will be found to have been "free from official restraint" if he establishes that he was among the first of the ship's occupants to reach the shore, that he landed on a deserted beach, or that he managed to flee into a neighboring community.

(7) In contrast, an alien who was escorted off the *Golden Venture*, pulled from the water by rescue personnel, or who landed in the cordoned-off area of the beach after it was secured will not be found to have been "free from official restraint," as his movements were restricted to the immediate vicinity of the beach that was cordoned-off and controlled by the enforcement officers of the various governmental organizations present at the site to prevent the ship's occupants from absconding.

(8) In a case where there is no clear evidence of the facts determinative of the entry issue, the case ultimately must be resolved on where the burden of proof lies.

(9) Where there is no evidence that an alien, who arrives at other than the nearest inspection point, deliberately surrenders himself to the authorities for immigration processing, or that, once ashore, he seeks them out, voluntarily awaits their arrival, or otherwise acts consistently with a desire to submit himself for immigration inspection, actual and intentional evasion of inspection at the nearest inspection point may be found.

(10) Pending a decision of the Attorney General on asylum and withholding of deportation claims premised on coercive family planning policies of another country, the Board will continue to follow *Matter of Chang*, 20 I&N Dec. 38 (BIA 1988), as precedent in all proceedings involving the same issues.

(11) To prevail on a claim that "extrajudicial" sources compromised the impartial and unbiased nature of an exclusion proceeding, an alien must show how the immigration judge's decision was affected or how he was prejudiced by these "outside influences."

EXCLUDABLE: Act of 1952—Sec. 212(a)(7)(A)(i)(I) [8 U.S.C. § 1182(a)(7)(A)(i)(I)]— No valid immigrant visa

Sec. 212(a)(7)(B)(i)(I) [8 U.S.C. § 1182(a)(7)(B)(i)(I)]— Nonimmigrant without valid passport

Sec. 212(a)(7)(B)(i)(II) [8 U.S.C. § 1182(a)(7)(B) (i)(II)]—No valid nonimmigrant visa or border crossing card

ON BEHALF OF APPLICANT:
Timothy J. Shultis, Esquire
Crabbs & Frey
14 Center Square
Hanover, Pennsylvania 17331

ON BEHALF OF SERVICE:
Jack Penca
Regional Counsel

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

On August 17, 1993, an immigration judge denied the applicant's motion to terminate the instant exclusion proceedings, found him excludable as charged on the basis of his admissions, and denied his applications for asylum and withholding of deportation. The applicant has appealed. The appeal will be dismissed and the request for oral argument before this Board is denied. 8 C.F.R. § 3.1(e) (1993).

The applicant is a 29-year-old married, male native and citizen of the People's Republic of China, who attempted to enter the United States on June 6, 1993. The applicant was taken into custody by the Immigration and Naturalization Service and detained for exclusion proceedings. He was charged as an excludable alien under sections 212(a)(7)(A)(i)(I), (B)(i)(I), and (B)(i)(II) of the Immigration and Nationality Act, 8 U.S.C. §§ 1182(a)(7)(A)(i)(I), (B)(i)(I), and (B)(i)(II) (Supp. IV 1992).

At the ensuing hearing, the applicant moved for termination of the exclusion proceedings. Arguing that an entry into the United States had been made within the meaning of section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13) (1988), he provided a testimonial account of his arrival into the United States and several newspaper articles describing the events of the early morning hours of June 6, 1993. The Service objected to the motion and countered with its own evidence of the events of that morning in the form of a Service examiner's "Memo to

File" and an affidavit of its Special Agent, Sal Alosi. The immigration judge denied the applicant's motion and proceeded to hear testimony on his applications for asylum and withholding of deportation. Ultimately, the immigration judge found the applicant excludable as charged on the basis of his concessions and denied his applications for the requested forms of relief. This appeal followed.

The applicant's first challenge on appeal concerns the propriety of these exclusion proceedings.

To determine whether the instant proceedings brought under section 236 of the Act, 8 U.S.C. § 1226 (1988 & Supp. IV 1992), are proper, we must first resolve the issue of whether the applicant "entered" the United States within the meaning of section 101(a)(13) of the Act, for if an "entry" occurred, the question of the applicant's continued presence here may only be adjudicated in deportation proceedings commenced under section 242(b) of the Act, 8 U.S.C. § 1252(b) (Supp. IV 1992).[1]

## GENERAL FACTS OF SHIP'S ARRIVAL

The record reflects the applicant arrived in the United States on Sunday, June 6, 1993, aboard a cargo freighter named the *Golden Venture*. The applicant was one of a cargo of some 300 passengers when the vessel, piloted by a crew of 13 Indonesian nationals, ran aground on a sandbar off the coast of New York. The grounding took place 100 to 200 yards offshore of the Fort Tilden military reservation located on the Rockaway Peninsula in the Gateway National Recreation Area of Queens, New York.

According to the record, at about 1:45 a.m. on that Sunday, two officers of the United States Department of Interior Park Police were patrolling the Gateway National Recreation Area when they observed the distressed ship and a number of its passengers swimming in the water or running on the beach. The officers spotted life preservers bobbing in the water and heard people yelling.[2] At 1:58 a.m., the officers placed an emergency call for help to the New York City Police Department and other authorities and then proceeded to assist several of the ship's passengers out of the water.

The Coast Guard dispatched boats and helicopters to the scene of

---

[1] Deportation and exclusion proceedings are mutually exclusive methods of removing an alien from the United States. Sections 236 and 242(b) of the Act; *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958). However, the question of whether an alien has effected an entry is appropriately litigated in exclusion proceedings. *Landon v. Plasencia*, 459 U.S. 21, 31 (1982).

[2] The record indicates the Coast Guard had been monitoring the ship the previous night as it neared the coast. When vessels were dispatched to intercept it, however, the ship disappeared.

the reported shipwreck to observe and rescue persons aboard the disabled vessel.

At 2:19 a.m., officers from the New York City Police Department arrived on the beach at Fort Tilden; 2 minutes later, the New York City Fire Department was alerted. Police canine units and New York State police helicopters equipped with searchlights also were deployed to search for passengers on shore or still in the water. Officers from the various law enforcement agencies involved—the New York City Police Department, the Park Police, the Jacob Riis Park Police, and the Coast Guard—waded into the harbor to assist people to shore.

During these early morning hours, a portion of the Fort Tilden beach—about 1/4- to 1/2-mile-long and extending 600 yards inland from the water line—was ultimately cordoned off and controlled by enforcement officers of these various organizations to prevent passengers who reached shore from leaving the area.

According to newspaper accounts of several passengers interviewed, pandemonium erupted on board when the ship grounded. Passengers began spewing out of the cargo hold of the ship, where they had been forced to stay during their 3-month-long voyage. They crowded the ship's deck, only to be told by the ship's crew to jump overboard.

Over the next several hours as rescue personnel assembled in the area, about 200 passengers fled the ship by leaping blindly into the surf or descending a ladder on the side of the boat. Ignoring police and Coast Guard pleas to remain on the vessel, many swam and waded to shore clutching plastic bags of belongings while others used plastic jugs as makeshift floats.

An armada of small vessels, rafts, and cutters fished many of these 200 out of the 53-degree waters and brought them to shore.[3] Other passengers managed to reach dry land on their own only to be apprehended on the beach or within the perimeter of the cordoned-off area. Many of the ship's occupants who swam to shore suffered from hypothermia and simply collapsed on reaching the beach. A few, however, eluded capture by fleeing through the thick-brushed dunes into the surrounding neighborhoods. Several of these survivors were reported seen knocking on the doors of homes in several nearby communities, offering money in exchange for the use of a telephone. Three men, for example, were found in a construction site in the neighboring town of Breezy Point after having offered a resident $100 to use his telephone. Local police later apprehended 26 other men near a shopping center in the town of Huntington Beach after receiving an

---

[3] The Coast Guard recovered the bodies of four passengers who had drowned in the choppy waters. Three other passengers plucked from the 53-degree waters died later.

anonymous telephone call that several Asian men were seen leaving a tan van.

More than 100 passengers, however, remained on board and awaited the arrival of rescue personnel.

In an effort to detain those passengers apprehended, a building in the Fort Tilden military reservation was used to house passengers not in need of medical treatment; these individuals were subsequently transferred to detention facilities for immigration processing. Police escorted about 30 other passengers to local hospitals for treatment; these passengers were later released to the immigration authorities.

By 3:30 a.m., when the first immigration officials arrived, 200 to 300 rescue personnel were at the scene. Swimmers were still being pulled from the water and passengers were still being rescued from the boat.

Understandably under the circumstances, no attempt was made to differentiate and keep track of those persons rescued from the deck of the *Golden Venture*, plucked from the water, intercepted within the cordoned-off area, or taken to medical facilities. Immigration officials processed all detainees as one large group.

By the evening of June 6, 1993, 273 of the 300 passengers reported to have been aboard the vessel had been accounted for while some 30 remained at large. Law enforcement authorities took the captain of the freighter and his crew of 12 off the ship and arrested them pending criminal prosecution on smuggling charges.[4]

## THE ISSUE OF ENTRY

In relevant part, an "entry" for immigration purposes is defined as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise." Section 101(a)(13) of the Act. Over time, caselaw has led to the formulation of a more precise definition of that term, requiring: (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2) (a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint. *Matter of Patel*, 20 I&N Dec. 368 (BIA 1991), and cases cited therein; *see also Correa v. Thornburgh*, 901 F.2d 1166, 1171 (2d Cir. 1990).

The definitional "entry" requirements at issue in this case are those of evasion of inspection and freedom from official restraint. It is this

---

[4] According to newspaper accounts, the *Golden Venture* sailed from Thailand with its cargo of illegal Chinese immigrants as part of an elaborate multimillion-dollar smuggling operation. Many passengers paid more than $20,000 or agreed to pay off a portion of the fee by agreeing to be indentured servants in this country.

latter requirement, however, which is the principal focus of the parties on appeal.

Regarding the requirement of freedom from official restraint, we note at the outset that, in circumstances such as those now before us, there can be no certainty as to when and under what precise circumstances during those few critical hours immediately following the *Golden Venture's* grounding each and every individual alien landed on shore. Viewing the situation in its totality, however, it is clear that some passengers of the *Golden Venture* arrived in the United States free from official restraint, while others did not. *See United States v. Vasilatos*, 209 F.2d 195, 197 (3d Cir. 1954); *United States v. Lazarescu*, 104 F. Supp. 771, 777 (D. Md.), *aff'd*, 199 F.2d 898, 900 (4th Cir. 1952); *In re Dubbiosi*, 191 F. Supp. 65, 66 (E.D. Va. 1961).

For example, although the exact number may never be known, several of the ship's occupants, presumably the first to jump ship, did reach dry land before the vessel was spotted by the two Park Police officers who first observed the disabled ship at 1:45 a.m. According to the record, the officers witnessed "numerous" individuals running "to avoid detection." These passengers were clearly free from any official restraint. Similarly, other evidence in the record suggests that several passengers were found, possibly hours later, in neighboring communities. These aliens were not only free from any restraint, but were in fact mixing with the general population. *See, e.g., United States v. Martin-Plasencia*, 532 F.2d 1316 (9th Cir.), *cert. denied*, 429 U.S. 894 (1976) (finding that an alien at a port of entry effected an entry when he evaded inspectors and fled 50 yards into San Ysidro, California); *Cheng v. INS*, 534 F.2d 1018, 1019 (2d Cir. 1976); *Matter of Z-*, 20 I&N Dec. 707 (BIA 1993) (finding that an alien who debarks from his vessel at a place not designated as a port of entry effected an entry when he fled into the interior undetected with every apparent intention of evading immigration inspection).

In contrast, for those 100 or more passengers who were escorted off the ship—as well as the many others who were pulled from the water by rescue personnel or who landed in the cordoned-off area after it was secured—we would not find that their physical presence here was coupled with "freedom from official restraint." The movements of these aliens were restricted to the immediate vicinity of the beach cordoned-off by the scores of law enforcement personnel at the scene. These aliens were never free to leave the area. They were never at liberty in the United States, and, under these circumstances, clearly lacked the freedom to go at large and mix with the general population. *See Correa v. Thornburgh, supra*, at 1172 (defining "freedom from official restraint" as freedom from constraint emanating from the government that would otherwise prevent the alien from physically

passing on); *Matter of Pierre*, 14 I&N Dec. 467, 469 (BIA 1973) (quoting *Ex parte Chow Chok*, 161 F. 627, 629-30, 632 (C.C.N.D.N.Y.), *aff'd*, 163 F. 1021 (C.C.A. 2 1908)); *Edmond v. Nelson*, 575 F. Supp. 532, 535 (E.D. La. 1983); *Matter of Yam*, 16 I&N Dec. 535, 536-37 (BIA 1978) (finding no entry to have been effected where alien found at border and taken under police guard to a medical facility).[5]

Thus, some passengers of the *Golden Venture* were clearly in this country free from official restraint, while others were not. However, in circumstances such as those which occurred on the morning of June 6, 1993, the facts of each individual case may never be clearly determinable for various reasons. For one, it could never be definitively established at what precise point the cordoned-off area of the beach at Fort Tilden was finally secured. Secondly, even if that time theoretically could be established, e.g. at 3:49 a.m., many aliens — even if testifying fully and truthfully—would not know exactly when they reached shore. Finally, particularly where saving lives was the primary concern of the government officials on the scene, one would not expect those officials to be recording specific data on the identities of each passenger or on the times when and circumstances under which each was taken into custody. Indeed, in many cases, particularly those involving aliens who managed to swim to shore, there likely will never be any certainty as to exactly when and under what circumstances they made it onto the beach.

If aliens can establish the specific circumstances of their arrivals, their cases can be resolved on the facts. For example, if an alien can show that he was one of the first passengers to disembark the ship and reach shore, or that he managed to arrive at a neighboring town, freedom from official restraint would be found.

On the other hand, in cases where there is no clear evidence of the facts determinative of the entry issue, those cases ultimately must be resolved on where the burden of proof lies. Accordingly, since it is the alien, with a limited exception not relevant here,[6] who bears the

---

[5] Similar cases can be found involving Haitians who arrived by private or makeshift boats at uncontrolled beaches having no immigration inspection facilities in southern Florida, made their way on land, and, shortly thereafter, were taken into official custody and ultimately processed in exclusion proceedings. *See, e.g., Bertrand v. Sava*, 684 F.2d 204 (2d Cir. 1982). We also note that it has never been held that the mere crossing into the territorial waters of the United States, whether detected or undetected, constitutes "physical presence" in this country "free from restraint." Nor would we find that the grounding of a vessel 100 or more yards off shore with passengers facing a hazardous (indeed, fatal for some) journey to land in itself constitutes an entry into this country.

[6] In exclusion proceedings involving an alien having a colorable claim to lawful permanent resident status, it is the Service who bears the burden of proving that the

burden of showing that exclusion proceedings are improper, it is he who must prove that his arrival on land constituted an "entry" into the United States within the scope of section 101(a)(13) of the Act. Section 291 of the Act, 8 U.S.C. § 1361; *Matter of Z-, supra,* at 710; *Matter of Matelot,* 18 I&N Dec. 334, 335 (BIA 1982); *Matter of De La Nues,* 18 I&N Dec. 140, 144 (BIA 1981); *Matter of Healy and Goodchild,* 17 I&N Dec. 22, 26 (BIA 1979); *Matter of Pierre, supra,* at 468.[7]

Turning to the case at hand, we note that, in support of his motion to terminate proceedings, the applicant testified that he was in (what appears to have been) the cargo hold of the ship when the vessel ran aground. According to the applicant, he made his way to the deck of the ship and was told by those in the front to jump. He did so and swam to shore clutching a plastic bag containing his personal belongings. He admittedly did not know how long he was in the water, but found himself cold and dizzy as he reached the shore.

Once on the beach, he quickly changed his clothes and went searching for a road in the dark. He did not recall being chased. He recounted having passed two roadways, but could not explain how far from the beach he had walked or in what direction he was walking when apprehended. He did not testify with any clarity as to any of the time frames involved. All he was certain of was that he was in New York. As he entered what he described as a "forest," he encountered two police officers who escorted him back to the beach and instructed him to lie on his stomach.[8] Eventually, the Service took the applicant into custody and detained him for exclusion proceedings. The applicant paid a down payment of 3,000 yuan for this voyage to the United States.

On appeal, the applicant argues that his testimony coupled with the circumstances surrounding his landing far from any inspection facility conclusively demonstrate that he had no intention of submitting

---

alien should be deprived of that status. *Matter of Z-, supra,* at 710; *Matter of Salazar,* 17 I&N Dec. 167, 169 (BIA 1979); *Matter of Kane,* 15 I&N Dec. 258, 264 (BIA 1975).

[7] In *In re Phelisna,* 551 F. Supp. 960 (E.D.N.Y. 1982), *appeal dismissed,* 729 F.2d 1444 (2d Cir. 1983), the United States District Court for the Eastern District of New York held that the burden of establishing that an alien had no intent to evade inspection and thus made no "entry" rested with the Government. That holding has never been adopted by a higher court, is not controlling authority in this circuit, and is not binding precedent on this Board. *See State of Ga. Dep't of Medical Assist. v. Bowen,* 846 F.2d 708, 710 (11th Cir. 1988); *Starbuck v. City & Cty. of San Francisco,* 556 F.2d 450, 457 (9th Cir. 1977); *Matter of K-S-,* 20 I&N Dec. 715 (BIA 1993); *Matter of Cerna,* 20 I&N Dec. 399 (BIA 1991), *aff'd,* 979 F.2d 212 (11th Cir. 1992).

[8] This testimony varies somewhat from the applicant's written account of that morning. In a statement attached to his motion to terminate, the applicant wrote that he crossed a road and a grassy field, and then came upon a second road, when he was spotted by two policemen and apprehended.

himself to the immigration authorities for inspection, thus proving that he actually and intentionally evaded inspection at the nearest inspection point.

We observe that nowhere in the record is there evidence suggesting that the applicant deliberately surrendered himself to the authorities for immigration processing, or that, once ashore, he sought them out, voluntarily awaited their arrival, or otherwise acted consistently with a desire to submit himself for immigration inspection. In fact, given the circumstances under which the *Golden Venture* landed,[9] the applicant's payment of money to a smuggling operation for passage to the United States, his lack of travel documents entitling him to enter this country, and his conduct once he came ashore, we find that the requisite intent to evade can be sufficiently gleaned from the record. *See Cheng v. INS, supra,* at 1019 (crossing the border from Canada in a smuggler's van at night without headlights, and turning away from the nearest inspection station, provided "overwhelming" evidence of actual and intentional evasion of inspection); *Matter of Estrada-Betancourt,* 12 I&N Dec. 191, 194 (BIA 1967) (finding evasion where aliens arriving at other than a designated port proceed 10 miles inland with intention of presenting themselves for inspection at other than the nearest inspection point); *see also United States ex rel. Giacone v. Corsi,* 64 F.2d 18 (2d Cir. 1933). *See generally Thack v. Zurbrick,* 51 F.2d 634, 635-36 (6th Cir. 1931); *but cf. Pierre v. Rivkind,* 643 F. Supp. 669 (S.D. Fla. 1986), *rev'd on other grounds,* 825 F.2d 1501 (11th Cir. 1987) (finding no evasion where alien arriving by boat walks away from the vessel and hides in a heavily-wooded mangrove area but later surrenders herself to the authorities).[10] As to the second requirement—freedom from official restraint—the applicant points out on appeal that some passengers did manage to make their way into neighboring towns, thereby proving he too was "free from official restraint."

As noted above, the applicant is correct in his assertion that several passengers from the *Golden Venture* were found in nearby communities. However, the applicant does not allege nor can we find any

---

[9]The vessel did not arrive at an inspection station, nor did the captain and crew restrict the passengers to the ship pending immigration clearance once the ship grounded. As the evidence reflects, the crew unlocked the cargo hold and apparently encouraged the 300 or so passengers to jump and flee. Although it is unclear on this record whether the grounding was an accident or a deliberate act calculated to lessen the odds of the illegal off-loading being detected, the captain placed no distress call when the boat ran aground and many immigrants carried their belongings in plastic bags as if prepared for a swim.

[10]In *Matter of Z-, supra,* at 711-12, this Board recently held that an alien's intent in this context may be established absent a statement by the alien and even in the face of his contrary testimony.

evidence to suggest that he was one of those passengers. In this regard, it is incumbent upon the applicant to prove that his physical presence in the United States was coupled with "freedom from official restraint." Section 101(a)(13) of the Act; *Matter of Z-, supra.* From the applicant's testimony, however, it is not clear where in the continuum of events on the morning of June 6, 1993, he actually reached shore. No evidence was presented suggesting that he was one of the first passengers to reach dry land or that the beach was deserted when he landed, from which one might conclude that he was free from official restraint. We note that he did not have a watch and could not explain how long he was in the water or how many minutes passed before he was caught. He admittedly did not know where he was when he was apprehended, in what direction he was walking, or how far from the beach he had travelled. Consequently, we do not find that the applicant has presented clear evidence that he was ever free from official restraint. As such, we do not find that he has met the burden, which he alone must bear, of demonstrating that he made an entry into the United States. Accordingly, we find that these exclusion proceedings are proper.[11]

## ASYLUM AND WITHHOLDING OF DEPORTATION

The applicant has requested relief from exclusion by way of asylum and withholding of deportation. In support of his applications, the applicant testified that he fled China because he violated that country's mandatory family planning policies—with which he disagrees—by having more than one child. He claims that he fled China to escape persecution stemming from these policies and fears that he would be jailed, fined, and sterilized upon his return.

The record reveals the applicant is a stone cutter by profession and a father of two from the city of Fuzhou, Fujian province, China. The applicant's problems with the Chinese Government began in October 1990 when the local family planning authorities fitted his wife with an

---

[11] Counsel for the applicant represents in his appeal brief that an ongoing human salvage operation was underway both in the water and on the beach when the applicant was swimming to shore. These assertions, however, are not based on counsel's personal knowledge and have never been corroborated personally by the applicant. *See Matter of Ramirez-Sanchez,* 17 I&N Dec. 503, 505 (BIA 1980).

The applicant also advances the claim that the humanitarian efforts of the governmental authorities on June 6, 1993, should not be construed as "official restraint." No legal authority has been cited in support of this contention; nor are we inclined to agree with the applicant in the face of clear evidence in the record of the efforts undertaken by these officials to prevent the passengers of the *Golden Venture* from leaving the Fort Tilden area. *See Correa v. Thornburgh, supra,* at 1172; *Edmond v. Nelson, supra,* at 535; *Matter of Yam, supra,* at 536-37 (BIA 1978) (involving alien found at border and taken under guard by local police to a medical facility).

intrauterine device after the birth of their first child (a son). To monitor the couple's use of contraception, the authorities conducted monthly physical examinations of the applicant's wife and furnished the applicant and his wife with a record book in which the province's mandatory birth control policies and related penalties were set forth.

Around March 1992, the applicant's wife became pregnant with their second child. To conceal the pregnancy from the authorities, the applicant and his family left their house and resided in other parts of the city.[12] In their absence, the authorities appropriated their possessions and interrogated the applicant's parents. When his parents feigned ignorance about the applicant's whereabouts, the authorities threatened his parents with imprisonment and destroyed their home, thereby forcing them to flee the city. Fearful of further retribution for having more than one child, the applicant left China in February 1993, leaving behind his wife and two children.

To prove that his fears of punishment are well founded, the applicant recounted that his underage cousin suffered a forced abortion when she was 7 months pregnant with her second child. In addition, his sister incurred heavy fines after the births of three of her four children, and her house was destroyed when she was unable to pay the fines in full.

In a letter the applicant recently received from China, his wife wrote that the birth control authorities have fined him RMB 11,300 and are requiring her to undergo sterilization. She went on to explain that, until these demands are met, the authorities will not allow her to register the birth of their second child with the civil registrar. His wife included with her letter a photograph of herself and their two children; a copy of the family's household registration book; and a notice purportedly issued by the In-Shih Village Committee informing the applicant that he was being fined for violating China's family planning policies.[13]

The applicant also furnished for the record voluminous background material about China's coercive family planning policies, including a "Master Exhibit" prepared by the Nationalities Service Center on behalf of the applicant and other former passengers of the *Golden Venture*.[14]

---

[12] The applicant's wife moved to an aunt's home; the applicant frequently relocated until he was able to leave China 11 months later.

[13] Although not an issue on appeal, this Board notes that the notice from the In-Shih Village Committee was not certified in accordance with 8 C.F.R. § 287.6 (1993). *See Matter of Bader*, 17 I&N Dec. 525, 526 (BIA 1980).

[14] The "Master Exhibit" was admitted into evidence by the immigration court sitting in Baltimore, Maryland, but not included in the record of proceedings as a matter of convenience for the parties.

As required by 8 C.F.R. § 208.11 (1993), a copy of the applicant's Request for Asylum in the United States (Form I-589) was forwarded for comment to the Bureau of Human Rights and Humanitarian Affairs of the Department of State ("BHRHA"). The BHRHA responded in August 1993 with a report entitled "Asylum Claims Relating to Family Planning in Fujian Province, China."

Based- on this evidence and our precedent decision in *Matter of Chang*, 20 I&N Dec. 38 (BIA 1988), the immigration judge determined that the applicant was not eligible for asylum or withholding of deportation. In denying the applicant relief, the immigration judge found that the applicant had failed to demonstrate that China's one couple, one child policy was applied to him for persecutory motives as required by *Chang*.

On appeal, the applicant has raised several challenges to this denial of discretionary relief. The Center for Reproductive Law & Policy has likewise filed an amicus curiae brief in support of the appeal.

First, the applicant complains that the immigration judge wrongfully decided his case under *Matter of Chang, supra*. He argues that the holding in *Chang* has been implicitly overruled by the following: (1) an August 5, 1988, memorandum of the Attorney General to the Commissioner of the Service directing all "INS asylum adjudicators" to give "careful consideration" to applications from Chinese nationals who refused to abort a pregnancy or resisted sterilization as an "act of conscience"; (2) interim regulations that were promulgated by the Attorney General on January 29, 1990; (3) Executive Order No. 12,711, 55 Fed. Reg. 13,897-98 (1990); and (4) a November 7, 1991, memorandum of the General Counsel of the Service subscribing to the view that China's coercive family planning policies constitute persecution on account of political opinion.

We have carefully considered the applicant's present challenges, the background materials contained in the Master Exhibit, and the amicus brief submitted in support of this appeal. Nevertheless, we remain of the opinion that our interpretation of the law regarding China's one couple, one child policy articulated in *Matter of Chang, supra*, is legally correct and consistent with *INS v. Elias-Zacarias*, 502 U.S. 478, (1992).[15]

---

[15] The arguments advanced in the amicus brief neither compel us to disturb our holding in *Chang* nor persuade us to modify it in any way. For example, although it is argued that the United States is obligated under various international human rights instruments to recognize coercive interference with a person's right to reproductive self-determination as persecution, these instruments do not provide potential avenues of relief to aliens in exclusion proceedings beyond those provided for in the Immigration and Nationality Act and implementing regulations. *See Matter of Medina*, 19 I&N Dec. 734 (BIA 1988).

First, the "policy guidelines" announced by Attorney General Meese on August 5, 1988, regarding the one couple, one child policy do not apply to decisions by the immigration judges and this Board. *Matter of Chang, supra,* at 43; *see also United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954); 8 C.F.R. §§ 2.1, 3.1, 3.10, 208.2(b), 236.1, 236.3, 242.8(a) (1993).[16] Second, the interim regulations cited by the applicant were never finalized. 55 Fed. Reg. 2804 (1990).[17] On July 27, 1990, the Attorney General issued final regulations governing the adjudication of asylum and withholding of deportation applications which superseded these interim regulations. *See* 55 Fed. Reg. 30,680 (1990) (codified at 8 C.F.R. Parts 3, 103, 208, 236, 242, and 253 (1991)). The final regulations, which are currently in effect, did not incorporate any of the provisions of the interim regulations concerning asylum and withholding claims premised on coercive family planning policies of another country, and, in fact, make no reference to such policies.[18]

Third, while Executive Order No. 12,711 directs the *Secretary of State and the Attorney General* to give enhanced consideration to the asylum and withholding claims of individuals who express a fear of persecution related to a policy of forced abortion or coerced sterilization, the Attorney General has never directed this Board to evaluate these claims other than in accordance with the standard enunciated in the July 27, 1990, regulations. *See* 8 C.F.R. Part 208 (1993).[19] These regulations represent the most recent directive by the Attorney General in this area and are binding on both this Board and the immigration judges. *See Matter of Fede,* 20 I&N Dec. 35 (BIA 1989); *Matter of Anselmo,* 20 I&N Dec. 25 (BIA 1989).

Lastly, we note that in his November 7, 1991, memorandum, the former General Counsel of the Service expressed a view of the law with respect to persecution claims based upon coercive birth control policies contrary to that found in *Matter of Chang, supra.*[20] This

---

[16] In *Matter of Chang, supra,* the respondent urged this Board to apply these "policy guidelines" to his case. It was the Service's apparent position, however, that the case did not fall within the reach of the guidelines. *Id.* at 9.

[17] These regulations, which were to be codified at 8 C.F.R. §§ 208.5 and 242.17(c), provided that aliens fleeing their country's family planning policies of forced abortions or sterilization may be considered to have a well-founded fear or a clear probability of persecution on account of political opinion. *See* 55 Fed. Reg. 2804, 2805 (1990).

[18] The applicant's reliance upon an April 2, 1990, memorandum of the Commissioner of the Service is misplaced. This memorandum was written in response to the interim regulations and was intended as a policy guideline to Service adjudicators in the implementation of those regulations.

[19] President George Bush issued Executive Order No. 12,711 on April 11, 1990.

[20] In the memorandum, it was stated that "Department of Justice and INS policy with respect to aliens claiming asylum or withholding of deportation based upon coercive

memorandum, however, has no binding effect on the decisions of this Board and the immigration judges. Moreover, where the opinion expressed relies for its support on authority that predates the Attorney General's final regulations and appears to be inconsistent with *INS v. Elias-Zacarias, supra*, at 481-85 (holding that since the Immigration and Nationality Act makes motive critical, persecution on account of political opinion requires evidence that the alien has a political opinion and that the persecution feared would be "on account of" that opinion), we find it to be of little, if any, persuasive authority on the present issue. *See Lee v. INS*, 685 F.2d 343 (9th Cir. 1982); *Matter of Chang, supra,* at 43; *Matter of M/V Saru Meru,* 20 I&N Dec. 592 (BIA 1992); *Matter of Salim,* 18 I&N Dec. 311, 315 (BIA 1982); *Matter of Cavazos,* 17 I&N Dec. 215 (BIA 1980).

On June 7, 1993, we referred two of our decisions involving these issues to the Attorney General for review under the provisions of 8 C.F.R. § 3.1(h) (1993). Pending the decision of the Attorney General on these referred cases, we will continue to follow *Matter of Chang, supra,* as precedent in all proceedings involving the same issues, including the case now before us. *See* 8 C.F.R. § 3.1(g) (1993). Accordingly, we will deny the applicant's request for a stay of these appellate proceedings pending the Attorney General's review of the two referred cases.

Turning to the particulars of this case, we do not find that the applicant was persecuted in the past or that he possesses a "well-founded fear" of persecution on account of his race, religion, nationality, membership in a particular social group, or political opinion. Sections 101(a)(42)(A) and 208(a) of the Act, 8 U.S.C. §§ 1101(a)(42)(A) and 1158(a) (1988); *INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987) (holding that a "well-founded fear of persecution" standard applicable to asylum requests is significantly different from, and, in fact, requires a lesser degree of proof than the "clear probability" of persecution standard applicable to withholding requests); *Janusiak v. United States INS,* 947 F.2d 46, 47 (3d Cir. 1991); *Matter of Mogharrabi,* 19 I&N Dec. 439, 445 (BIA 1987) (finding that an applicant for asylum has established a well-founded fear if a reasonable person in his circumstances would fear persecution on account of one of the grounds enumerated in section 101(a)(42) of the Act); *Matter of Chen,* 20 I&N Dec. 16 (BIA 1989) (stating that an

---

family planning policies is that the application of such coercive policies does constitute persecution on account of political opinion." According to this view, aliens whose claims were based on birth control measures involving forced abortion or coerced sterilization were not required to demonstrate that the coercive measures were tied to a governmental purpose other than to control the population.

applicant for asylum may establish his claim by presenting evidence of past persecution in lieu of evidence of a well-founded fear of persecution); *Matter of Chang, supra*; 8 C.F.R. § 208.13 (1993).

The applicant contends that he was persecuted by the Chinese Government when it confiscated his property in accordance with their general population control policies. He further claims that he will face future persecution there in the form of sterilization, imprisonment, and a fine should he return. However, as we held in *Matter of Chang, supra*, at 43, the Chinese Government's implementation of its family planning policies is not on its face persecutive and does not by itself create a well-founded fear of persecution on account of one of the five grounds delineated in the Act, even to the extent that involuntary sterilization may occur. Thus, it is not enough for the applicant to show that such acts may have occurred or that there is a reasonable possibility that they would occur upon his return to China. To prevail on a claim premised on China's one couple, one child policy, it is incumbent upon the applicant to come forward with facts that establish that the policy was being selectively applied against him as a member of a particular religious or other social group, or being used as a means to punish him because of his race, nationality, or political opinion. *Id.* at 43.

To this end, we note that however strongly the applicant may believe his violation of China's one couple, one child policies was an expression of a political opinion, he has provided no evidence even suggesting that the actions taken against him and his family were intended to punish him for that reason. The applicant never openly disagreed with the local family planning officials, or made known to them his opinion of their policies or his reasons, if any, for choosing to have another child. Nor is there any evidence indicating that his treatment was disparate or in some way more severe than the treatment of others who, like himself, violated the policy.

On appeal, the applicant relies on *Desir v. Ilchert*, 840 F.2d 723 (9th Cir. 1988), a case involving a Haitian national who, because of his financial inability, refused to pay bribes to certain government officials. In that case, the United States Court of Appeals for the Ninth Circuit found that Desir had been persecuted, reasoning that the Government of Haiti perceived Desir to be a political subversive because of his refusal to pay.

To the extent *Desir v. Ilchert, supra*, has been cited for the proposition that asylum could be granted on the basis of a perceived or "imputed political opinion," it lends little support to the applicant's present claim to relief. Nowhere in the record is there evidence suggesting that the Chinese authorities have ascribed a political opinion to the applicant contrary to their own or revealing a

motivation on their part to penalize the applicant apart from his failure to observe that country's birth control policies.[21]

Abortion and sterilization may be untenable to the applicant's political beliefs. Coerced abortions and sterilization are certainly horrible acts. However, as the applicant has failed to show that the one couple, one child policy was applied to him for reasons protected under the Act, he has not demonstrated his eligibility for asylum under section 208(a) of the Act, and, accordingly, has failed to satisfy the more rigorous "clear probability" standard of eligibility required for withholding of deportation. See INS v. Elias-Zacarias, supra, at 403; Matter of Chang, supra; section 243(h) of the Act, 8 U.S.C. § 1253(h) (1988 & Supp. IV 1992); INS v. Stevic, 467 U.S. 407, 429–30 (1984). The evidence presented does not demonstrate that it is more likely than not the applicant would be subject to persecution on account of one of the five grounds specified in section 243(h) of the Act. See 8 C.F.R. § 208.16 (1993).

Nor are we persuaded to grant the applicant asylum or withholding of deportation because he claims to have violated his country's travel laws. First, the applicant has not shown that he violated any law related to his exit from China. Moreover, even assuming that he did, he has not demonstrated that the prosecution he fears is on account of his political opinion or any other ground enumerated in the Act. See Janusiak v. United States INS, supra; Blazina v. Bouchard, 286 F.2d 507 (3d Cir.), cert. denied, 366 U.S. 950 (1961); Coriolan v. INS, 559 F.2d 993, 1000 (5th Cir. 1977); Matter of Sibrun, 18 I&N Dec. 354 (BIA 1983); Matter of Matelot, supra, at 337; Matter of Nagy, 11 I&N Dec. 888 (BIA 1966); see also Rodriguez-Rivera v. INS, 848 F.2d 998, 1005 (9th Cir. 1988); Zupicich v. Esperdy, 319 F.2d 773 (2d Cir. 1963), cert. denied, 376 U.S. 933 (1964).

---

[21] In a January 19, 1993, legal opinion addressing the issue of the continuing viability of the imputed political opinion doctrine in light of the decision in INS v. Elias-Zacarias, supra, the General Counsel of the Service stated that a "final rule" was signed by Attorney General Barr on January 15, 1993, essentially finalizing the January 1990 interim rules that had been previously superseded. This rule provided that "an applicant who establishes a well-founded fear that he or she will be forced to undergo abortion or sterilization pursuant to the implementation of a coercive family planning policy, or will be persecuted for failure to do so, shall be regarded as having established a well-founded fear of persecution on account of political opinion." The rule further provided that an applicant "is not required to make a separate showing that the persecutor will impute a political opinion to him or her." This rule, however, was never promulgated. Moreover, this legal opinion, like the November 7, 1991, memorandum of the former General Counsel of the Service, does not appear consistent with the decision of the Supreme Court of the United States in INS v. Elias-Zacarias, supra.

## THE FAIRNESS OF THE HEARING

The applicant's final challenge concerns the fairness of the hearing that he was afforded before the immigration judge. It is the applicant's position that "extrajudicial" sources prevented the immigration judge from rendering an independent determination and compromised the impartial and unbiased nature of the proceedings below.

The applicant submits that an attorney representing another passenger on the *Golden Venture* contacted the Immigration Court in Baltimore, Maryland, to request a continuance of the hearing, only to learn that the Court was explicitly directed by the White House not to grant such requests.[22] The applicant also references two newspaper articles in which officials from the United States Department of State and United States Department of Justice "confirmed" the administration's interest in expediting the cases of *Golden Venture* as a deterrent against future smuggling operations. *See Chinese Immigrants Refuse to Eat*, Philadelphia Inquirer, August 21, 1993, at A10; *U.S. Tightens Asylum Rules For Chinese*, New York Times, September 5, 1993, at 45. The applicant further references a quote in one of the articles in which an unidentified employee of the Service described 99% of the *Golden Venture* immigrants' claims as "bogus." *See Chinese Immigrants Refuse to Eat, supra*, at A10.

The applicant contends that this direct interference by the White House coupled with the administration's expressed desire to "send a signal" to future Chinese immigrants and smugglers have tainted these proceedings and those of other *Golden Venture* aliens. He argues that the disparity between the approval rates of the asylum requests of aliens from the *Golden Venture* and other Chinese aliens whose applications were adjudicated in 1992 prove that the Clinton administration is seeking to "steer" the immigration judges to a specific political result.

Administrative proceedings must conform to the basic notions of fundamental fairness. *See Harisiades v. Shaughnessy*, 342 U.S. 580 (1952). However, we fail to see in what manner the applicant here has been denied a constitutionally fair hearing. For example, he does not explain how he himself was prejudiced by these "outside" influences or how the immigration judge's finding with respect to the entry issue and her denial of his applications for asylum and withholding of deportation stemmed from these "extrajudicial" sources. *See generally Garcia-Jaramillo v. INS*, 604 F.2d 1236, 1238-39 (9th Cir. 1979), *cert. denied*, 449 U.S. 828 (1980); *Matter of Santos*, 19 I&N Dec. 105 (BIA

---

[22] In an affidavit submitted for the first time on appeal, the attorney who was apprised of this communication admitted that she did not know the identity of the person to whom she had spoken.

1984). He cites no specific examples of misconduct on the part of the immigration judge to support the notion that her decision was decided on some basis other than her understanding and knowledge of the applicable laws and regulations and what she adduced from her participation in the case, and we can find none here. *See Matter of Exame*, 18 I&N Dec. 303 (BIA 1982); *Matter of Bader*, 17 I&N Dec. 525, 527 (BIA 1980); *Matter of Carrillo*, 17 I&N Dec. 30 (BIA 1979); *Matter of Lennon*, 15 I&N Dec. 9 (BIA 1974); *Matter of De Lucia*, 11 I&N Dec. 565 (BIA 1966), *aff'd*, 370 F.2d 305 (7th Cir. 1966); *Matter of Bufalino*, 11 I&N Dec. 351 (BIA 1965).

As for the statistical disparity between the approval rates of the *Golden Venture* cases and those of other Chinese nationals, it is largely, if not entirely, attributable to the difference between this Board's interpretation of the law regarding coercive family planning policies, as enunciated in *Matter of Chang, supra*, and the view adopted by the previous General Counsel of the Service. Thus, we do not find this empirical data persuasive to the applicant's present claim.

The applicant submits that the Clinton administration has made it known for some time that cases involving aliens smuggled into the United States, including those passengers on the *Golden Venture*, would receive expedited treatment to discourage illegal smuggling into this country. However, there is no evidence that the immigration judge was biased in her handling of the applicant's case or that the hearing afforded the applicant was unfair. Moreover, the attention given the applicant's case is no different than the priority attention given to other cases of aliens detained at government expense.

With regard to the alleged ex parte communication between the Clinton administration and the Office of the Immigration Judge, we are at a loss as to its relevance here. Aside from the fact that there is no evidence that such a communication occurred, the applicant never requested a continuance of the hearing on the merits of his applications and does not now allege that he was denied the opportunity to obtain legal representation or to prepare his asylum or withholding case. *See generally Saballo-Cortez v. INS*, 749 F.2d 1354 (9th Cir. 1984); *Matter of Carrillo, supra*, at 31. For these reasons, we do not find that the immigration judge erred in her handling of the proceedings below or in any way denied the applicant due process of law. Accordingly, the following orders will be entered.

**ORDER:** The appeal is dismissed.

**FURTHER ORDER:** The applicant's motion for a stay of these appellate proceedings before this Board is denied.

781